**In re T–H NEW ORLEANS LIMITED PARTNERSHIP.**

**FINANCIAL SECURITY ASSURANCE, INC., Appellant, Cross–Appellee,**

v.

**T–H NEW ORLEANS LIMITED PARTNERSHIP, Cross–Appellant, Appellee.**

Civ. A. No. 95–2383.
Bankruptcy No. 91–10681–JAB.

United States District Court,
E.D. Louisiana.

Nov. 3, 1995.

Eugene R. Preaus, Preaus, Roddy & Krebs, New Orleans, LA, Martin J. Bienenstock, Weil, Gotshal & Manges, New York City, for Financial Sec. Assur., Inc.

Rudy J. Cerone, McGlinchey, Stafford & Lang, New Orleans, LA, for T–H New Orleans Ltd. Partnership.

### RULING ON APPEAL AND CROSS–APPEAL

LIVAUDAIS, District Judge.

The appellant, Financial Security Assurance, Inc. ("appellant" or "cross-appellee" or "FSA") has filed an appeal from the bankruptcy court's orders of March 27, 1995, denying confirmation of the reorganization plan, March 30, 1995, confirming the plan, and June 27, 1995, denying appellant's motion for reconsideration or new trial. The cross-appellant, T–H New Orleans Limited Partnership ("cross-appellant" or "appellee" or "TH–NOLP"), has filed an appeal from the same bankruptcy orders. Both parties have filed reply briefs, respectively.

### I. STANDARD OF JUDICIAL REVIEW ON APPEAL

The appropriate level of judicial scrutiny of these appeals from the orders of the bankruptcy court (Records Documents 1, 3) is a *de novo* review of questions of law, and a "clearly erroneous" standard of review for questions of fact. However, factual conclusions based on misapplied or erroneous legal standards are subject to *de novo* review. Matters under the bankruptcy court's discretion are only reversible if an "abuse of discretion."

### II. TREATMENT OF APPELLANT'S (FSA) ISSUES ON APPEAL

A. "Whether the bankruptcy court erred in ruling that notwithstanding the amount of FSA's overcollateralization at confirmation, FSA is only entitled to postpetition interest from the time during the chapter 11 case that its collateral value at confirmation exceeded its unpaid claim amount?"

██ This complex issue raises a number of legal and factual questions. It rests, however, on a factual conclusion that was obviously rejected by the bankruptcy court. FSA was not "oversecured" or "overcollateralized"[1] at the time of petition (or even at the time of the confirmation hearing). The bankruptcy court found that on the basis of the evidence presented by both debtor and creditor the value of the hotel on July 14, 1994 was $13,700,000.00, while the value of FSA's claim was $13,748,000.00. Since FSA was undersecured, Bankruptcy Code Section 506(b) does not entitle FSA to postpetition, pre-confirmation interest. Whether or not FSA becomes oversecured at some later date is not relevant.[2]

██ Scholars seem to be in wide disagreement over these issues of time of valuation in conjunction with both entitlement to postpetition interest and the intertwined issue of entitlement to adequate protection payments.

---

1. Oversecured (and presumably overcollateralized) is the situation where the value of a secured asset (here, the hotel) exceeds the value of a creditor's total claim. Undersecured is the opposite factual scenario, i.e. the value of the claim exceeds the value of the collateral asset. An oversecured creditor is entitled to postpetition interest, while an undersecured creditor is not.

2. A creditor may often become factually oversecured during the course of the Chapter 11 case, particularly where, as in this case, the debtor is making pre-confirmation payments which lower the amount of the creditor's claim and where, also as in this case, the value of the collateral is increasing.

The parties themselves have glossed over the difference at times, and emphasized it at others. However, the issue of adequate protection payments is actually a moot point in this appeal. That issue arose before this court on the first appeal perfected in this case. The Fifth Circuit, while remanding on other issues, upheld that part of the May 1, 1992, Cash Collateral Order that ordered TH–NOLP to pay the accumulating "rents" from the Hotel to FSA. These payments have reduced FSA's original $18 million claim to $13.7 million over the course of this case. These payments were made, not as "adequate protection," but because FSA had a valid security interest in the rents themselves. The lower court gives lengthy analysis as to why these payments should reduce FSA's claim. Finally, the court adopts the line of jurisprudence referred to as the "subtraction cases."[3] Basically, this holding states that postpetition net rent payments made to an undersecured creditor decrease the amount of the creditor's secured claim. The reasoning is sound, and this court agrees with it.

However, at the time that the confirmation order came down, FSA had become an oversecured creditor. An oversecured creditor can claim postpetition interest and reasonable fees and expenses from the date of the petition. But, if interest were now calculated back to the petition date (as it should be), then the amount of FSA's claim would again exceed the value of the Hotel, and FSA would be an undersecured creditor. This anomalous result would occur either because the payments made by the debtor would actually have been applied to postpetition interest, resulting in no payment on principal; or, the amount of postpetition interest would have been added to the amount of FSA's claim, increasing it more than the amount by which the payments reduced the claim. To avoid this "vicious circle," it seems clear that FSA must either be "legally" oversecured or undersecured, irrespective of whether they later become "factually" undersecured or oversecured.

This still leaves unanswered the issue of when such valuation and determination of status occurs. The Code says little about valuation, except that a valuation should be based on all available circumstances and should be done for a specific purpose. While "[n]o rule is stated ... because no rule is possible ..." most courts and scholars agree that a valuation for this purpose, that is for determining over/under-secured status, should be done at the time of petition. RICHARD I. AARON, BANKRUPTCY LAW FUNDAMENTALS, § 12.06 (Clark Boardham Callaghan 1993); see also, In re Frengel, 115 B.R. 569 (Bankr.N.D.Ohio 1989.) This conclusion rests on policy reasons that allow the reorganizing debtor to reap the benefits of appreciation of the secured asset in order to give the debtor the incentive to maintain and improve the asset. This policy argument would fail, however, if the asset is appreciating on its own and with no input from the debtor or if the original mortgage on the asset was designed to give the creditor the benefit of the appreciation. This asset, the hotel, would not increase or even maintain its value without continual upkeep by the debtor, even given the bright future of hotels in the New Orleans area (i.e. tourists don't stay in "bad" or closed hotels.) And, appellant offered no evidence that the mortgage included as a benefit to the creditor the appreciation of the hotel.

Valuation at the petition date admittedly "comes at a price of distorting calculation upon which the confirmation is premised." AARON, Id. But this distortion is accepted because of the need to establish a static estimation of a fluid value and make determinations from it. This also has the positive effect, in furtherance of the policy goal, of giving the debtor a "fresh start" through reorganization. FSA is correct when it argues that no Code section nor court decision allows for repeated valuations of an asset in order to establish the propriety of postpetition interest. Once a creditor is deemed undersecured, he is always so for purposes of the reorganization plan.

Even though the determination of entitlement to postpetition interest is made early in the case, the calculation of such interest

---

**3.** ... as opposed to the "addition cases," one of which, *In re Union Meeting Partners,* appellant cites. The court believed these cases were distinguishable from the present situation for a number of reasons, with which this memo agrees.

must occur at the end of the postpetition, pre-confirmation period. *Matter of Seip,* 116 B.R. 709 (Bankr.D.Neb.1990.) The Code mandates this date in § 506, since the amount of the equity cushion remaining is the maximum amount of postpetition interest which the creditor may receive. As a result, a legally oversecured creditor (i.e. a creditor whose collateral value exceeds the claim value at the time of petition) might still receive no postpetition interest if at the end of the pre-confirmation period, the value of the collateral had decreased below the value of the claim or if the value of the claim had increased above the value of the collateral.

■ Further bolstering this point in the instant case is the fact that valuation occurred after the actual petition date, although before the confirmation date or the effective date of the plan. The claim of FSA decreased by the amount of the cash payments made to FSA by TH–NOLP under order of the lower court. At the same time, the value of the hotel was increasing, as was noted by the lower court. Both of these factors combined did not make FSA an oversecured creditor by the time of the confirmation hearing, and therefore FSA never gains an entitlement to postpetition, pre-confirmation interest. (N.B. It is important to note that the plan does give FSA interest payments after it becomes effective.)

This is not a case, as FSA has argued orally and in brief, where the value of the claim or the collateral is fluctuating greatly, making this determination unreliable from day to day. The collateral is steadily increasing, while the claim is steadily decreasing.

B. "Whether the bankruptcy court erred in ruling that the plan complies with Bankruptcy Code sections 1129(a)(1) and 1129(a)(2) and can legally discharge debt, notwithstanding Bankruptcy Code section 1141(d)(3) and the Debtor's prior inconsistent statements

and actions showing the plan is a liquidating plan?"

■ Bankruptcy Code § 1141(d)(3) reads:

(d)(3) The confirmation of a plan does not discharge a debtor if—

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

While the debtor would arguably be denied a discharge under § 727(a)(1)[4], the other conjunctive requirements are not met. The court below ably noted that (d)(3)(A) is not satisfied by the facts of this case. The plan does not necessarily provide for liquidation of all property because the debtor has the option of refinancing and paying the creditor in full.

§ 1141(d)(3)(B) is also not satisfied. The debtor will remain in business for at least two years, or until a third party buys the hotel (in which case FSA's claim will be completely paid.)

Furthermore, this entire "liquidating plan" argument seems baseless. The Code clearly contemplates that Chapter 11 plans may, among other things, liquidate estate property. 11 U.S.C. § 1129(a)(11); *see also, Locks v. United States Trustee,* 157 B.R. 89 (W.D.Penn.1993.) The only requirement is that the plan contemplates the liquidation. *Id.*

C. "Whether the bankruptcy court erred in ruling the plan was proposed in good faith under Bankruptcy Code section 1129(a)(3)?"

---

4. § 727(a)(1) requires that the debtor be an individual, not a partnership or corporation. This point would be arguable under a number of recent cases which seem to hold § 1141(d)(3) is

not applicable at all to non-individual debtors. This court does not reach this argument because the other requirements of the Code section are not met.

■ A bankruptcy court confirming a "cram-down"[5] Chapter 11 reorganization plan has an independent duty to analyze the debtor's plan to determine that it has met all the requirements of the Code, including § 1129(a)(3). The court must establish observance of the requirements by a preponderance of the evidence. The court below has dutifully performed such an analysis, section by section. It identified the appropriate law, correctly applied those precepts, and found that the plan satisfied the requirements with one exception, (discussed *infra.*) The court did not feel the plan arose in bad faith. Its findings of law are correct.

■ The appellant argues that the plan is not in good faith for two reasons. First, FSA argues that the plan must fall because TH–NOLP (and its related companies and organizations) resisted efforts by FSA to consolidate this proceeding with several other bankruptcy proceedings taking place in various jurisdictions in the United States. For whatever reasons, the cases never became consolidated, and any appeal options FSA may have had from that ruling have long since faded. The bankruptcy court refused (and obviously so) to hold that the exercise of procedural rights by TH–NOLP in other proceedings would result in this plan not being in good faith.

■ Secondly, FSA argued that the plan does not become effective until all of FSA's appeal options are exhausted, and the confirmation order is final. FSA reasons that since any appeal by it necessarily delays implementation of the plan, the debtor is attempting to chill FSA's right to appeal. However, courts have held that this type of conditional effective date is valid, since it is not "such an unreasonably long time as to conflict with the equitable balances set by Chapter 11." *In re Wonder Corp. of America,* 70 B.R. 1018, 1021 (Bankr.D.Conn.1987.) Furthermore, in the instant case, if FSA appeals (as it has done), the debtor will have to continue to make payments to FSA under

the lower court's 1992 cash collateral order. There is no prejudice to the appellant if he chooses to pursue an appeal.

D. "Whether the bankruptcy court erred in finding the Debtor's principals would infuse new capital to make the plan feasible in light of the absence of any identification of the principals, any · written commitments, and any statement of the terms of the purported infusions?

■ This argument seems to ignore the fact that the bankruptcy court retains power and jurisdiction over this estate at least until such point as the plan expires. If the principals of TH–NOLP do not make these cash contributions as they promised to do, FSA can simply move the court below to order said infusion. Although it would seem prudent to require a written promise from the principals, this court can find no Code section nor Bankruptcy rule that would require the court to order such writings. This decision of the implementation of the plan seemingly lies within the discretion of the bankruptcy court, and no "abuse of discretion" finding manifests itself. [N.B. The only time an infusion of capital is improper is when it allows a lower ranked creditor or interest holder to retain ownership while the claims of higher ranking creditors go unfulfilled; the so called "absolute priority rule." In this case, while the infused cash would go to inferior creditors, FSA's claim will still be completely satisfied.]

FSA also argues that the principals of TH–NOLP are unidentifiable parties who could not be forced to comply. This is inaccurate. As a partnership, TH–NOLP is bound by the acts of any of its partners. The court, in its memorandum opinion, notes the partners of TH–NOLP with specificity. The plan, when confirmed, will contain the promise of these partners to infuse the capital as needed. If they refuse, the bankruptcy court will have power to force the contributions.

**5.** "Cram-down" occurs when one class of creditors objects to the plan, while certain other classes agree to the plan.

E. "Whether the bankruptcy court erred by ignoring FSA's willingness to bid in the hotel at the confirmation hearing for the full amount of its claim plus postpetition interest and instead confirming a plan holding FSA at bay for at least two years when the debtor admitted having no equity in the property as of confirmation?"

Initially, this issue is moot because FSA had no entitlement to postpetition interest, thus it could not "bid in" its claim "plus postpetition interest." However, the underlying issue in this question for the court is whether the court must allow FSA to "bid in" at confirmation. By "bid in", one assumes FSA refers to using the debt as payment for the hotel itself; a *dation en paiment* under the civil law. While the plan might well have called for such a novation at confirmation, it did not. The debtor introduces the plan, not the creditor. The plan need not be the best alternative for the creditor, but only one that is fair, equitable and feasible under the Code. The court found the plan to be so, and no viable reason exists to overturn that finding, at least under an argument such as this. [N.B. At the end of the plan's two year life, such a giving in payment may occur, but it is not required by law to occur at confirmation.]

F. "Whether the bankruptcy court erred by ruling FSA's lien could be transferred to a purchase money note on the misunderstanding that the debtor would have an incentive to negotiate a purchase money note with all the usual and customary defaults and covenants?"

This argument is akin to the issue raised by the argument over the possible infusion of capital. The bankruptcy court will have continuing jurisdiction over the estate, at least to make sure that the debtor does not collude with an unnamed third party in order to defraud FSA. The ominous overtones of this issue are that TH–NOLP would bargain for a note that this third party would not be required to repay. FSA seems to make the argument against itself in the statement of the issue. "[W]ith all the usual and customary ..." seems to suggest that these defaults and covenants exist in every, or practically every purchase money note written and executed. By suggesting that TH–NOLP would do something unusual or out of the ordinary in order to defraud FSA is paranoid, if not ridiculous. TH–NOLP would have incentive to bargain in good faith for this note, in order to comply with its own plan, ordered and enforced by a bankruptcy court of the United States. On the other hand, TH–NOLP would not have an incentive to bargain for a note that some unknown and uninterested (in the bankruptcy and reorganization) would not be required to pay.

This point is moot when one realizes that the bankruptcy court would retain jurisdiction over the estate to enforce the plan it confirmed. Should this paranoia prove to have basis in reality, the creditor could, by motion, ask the bankruptcy court to issue appropriate orders.

G. "Whether the bankruptcy court erred by valuing the hotel as of May 1994 when confirmation did not occur until March 1995 and both parties' witnesses testified that the value of the hotel was constantly increasing?"

This issue hinges on the legal question discussed earlier, "when does valuation for § 506 occur?" Subsection I–A, *supra*. The lower court's finding is seemingly subject to *de novo* review on this point of law. As stated previously, FSA has shown no evidence that it bargained for the appreciation (other than the flat statement "FSA bargained for all appreciation of the Hotel.") Similarly, FSA has not produced any evidence that the Hotel would continue to appreciate without any maintenance or improvement by the debtor.

Furthermore, FSA is ignoring the clear language of § 506 in its argument that a creditor does not have to be "fully secured" in order to be entitled to post-petition interest. § 506 only allows post-petition interest when the value of the secured collateral exceeds the value of the secured claim. If the values are equal, i.e. the creditor is "fully secured", or if the value of the secured claim exceeds the value of the secured collateral, no interest accrues. § 506 leaves to the discretion of the court the determination of the actual time of valuation. Therefore, this decision is subject only to an "abuse of discretion" standard of review. Undoubtedly, a

court which rules in line with a majority of the jurisprudence has not abused its discretion.

H. "Whether the bankruptcy court erred in finding the fair market value of the Hotel is $13.7 million?"

██ Valuation is a mixed question of law and fact. The point of law to be articulated is how to value the property. The question of fact is what is the value under that proper method. Here, the bankruptcy court chose, and both parties used, a common "going concern" method of valuation. Nearly all (at least all cited and discovered) jurisprudence suggests that income producing property be valued as a going concern, unless the facts of the case clearly dictate otherwise. For example, if the income producing property were to be sold as scrap, then a "salvage" value would be appropriate. In this case, the Hotel is to be continuously operated as such, and the bankruptcy court's methodology of valuation is manifestly correct.

As to the factual issues, there are no obvious mistakes or miscalculations. The only fact at issue is the inclusion or exclusion of one item in both parties estimates. The appellant would exclude an expense for "overhead costs," while the appellee would include it. The bankruptcy court ruled that the expense was proper and fair, and that it should therefore be included in the valuation. When it is so included in the appellant's estimates, the two values are identical. Nothing in this analysis is "clearly erroneous."

I. "Whether the bankruptcy court erred in ruling the debtor's chapter 11 plan is feasible for purposes of Bankruptcy Code section 1129(a)(11)?"

██ FSA makes the argument that the plan is not feasible under § 1129(a)(11). This would mean that a subsequent liquidation or reorganization is likely to occur if the plan is confirmed as written. In support of this, FSA offers five facts:

(1) the principals who would infuse capital to make the plan work are not identified and have given no written commitments;

(2) T–H admittedly intends that the appreciation of the Hotel will be counted on to satisfy the plan;

(3) T–H used high revenue projections for showing feasibility while using low projections for valuations;

(4) one of the debtor's officers left out several material expenses exceeding $140,-000;

(5) the plan does not expressly require T–H to bargain for a purchase money note that is enforceable.

FSA leaves to this court's inferences the implications of these facts. A number of these facts are dealt with at other points in this opinion. Fact (4) is of unknown significance, as is (2). Fact (3) is simply a function of marketplace dynamics, as well as the Code's own admonition that each valuation is to be made for a specific purpose.

However, even taken in a light most favorable to FSA, the entirety of these facts do not make the plan infeasible. The plan is not an all or nothing proposition; there are numerous alternatives, all of which should (or at least reasonably could) result in the full payment of FSA's claim. The bankruptcy court noted in its opinion that the plan calls for either refinancing of the debt through a third party, contemplating full payment of FSA's claim at that time; or sale of the Hotel to a third party; or a *dation en paiment*, giving the Hotel to FSA in return for a release of liability. In an very similar circumstance, a bankruptcy court ruled that when a plan so included alternative proposals, at least one of which was obviously feasible, the plan as a whole was feasible. *In re Nite Lite Inns,* 17 B.R. 367 (Bankr.S.D.Cal. 1982). Since this plan includes the liquidation scenarios which would fully compensate FSA without any action (positive or negative) by TH–NOLP, the plan as a whole is feasible under § 1129(a)(11).

██ It is important to note that a feasible plan is not the same as a plan which would best suit the creditors. The laws and jurisprudence of bankruptcy note often that there are two competing goals of bankruptcy and reorganization. One is the satisfaction of valid claims against the estate. The other is to allow the debtor a "fresh start" in the marketplace. A feasible plan attempts to achieve both goals.

J. "Whether the bankruptcy court erred in ruling the appropriate interest rate under the plan is 11.5%?"

██ The methodology of choosing an appropriate cram-down interest rate has been the subject of numerous scholarly works, perhaps suggesting that the jurisprudence is unsettled in this area. However, when those legal scholars actually investigate the case law, little diversity actually exists. Almost every court considering the issue has held that the appropriate rate of interest is the market rate of interest on similar loans between typical borrowers and lenders, plus a case-specific premium to compensate for risk. 5 COLLIER ON BANKRUPTCY, p. 1129.03 (LAWRENCE P. KING, ed. 15th ed. 1993.) *See also*, Friedman, "What Courts Do To Secured Creditors in Chapter 11 Cram Down", 14 Cardozo L.Rev. 1495, 1514 (1993.) Often, the court finds that the rate bargained for in the original contract is reflective of that market rate, and holds that the contract rate should apply. Friedman, *Id.* at 1516. Less frequently, courts have used a formula approach based on Treasury securities for similar lengths of time plus a risk premium (usually of 1 to 2%.) *Id.* at 1516. Finally, where there is little to no evidence of the proper rate, the court may apply the contract rate in default. *Id.* at 1517. The bankruptcy court in the instant case applied the contract rate of 11.5%. Both parties have appealed this finding; the creditor of course feels it is too low, the debtor, too high.

TH–NOLP argues that the proper rate is 8.45%. This rate is based on the rate of interest of Treasury securities of similar duration plus a case specific risk premium of 1 to 2%. In arguing this point, the debtor relies on 1993 Fifth Circuit decision, *Matter of Briscoe Enter., Ltd., II*, 994 F.2d 1160 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993.) In *Briscoe*, the Fifth Circuit noted that proper standard of review for a bankruptcy court's finding of an appropriate interest in cram-down cases is "clearly erroneous." *Id.* at 1169. In a rather disingenuous reading of *Briscoe*, TH–NOLP suggests that the rate set should be based on the aforementioned Treasury security formula. In actuality, the court of appeal said that such rate is "instructive," but not dispositive. *Id.* In fact, in *Briscoe*, the appellate court upheld the bankruptcy court's finding that the appropriate rate of interest was the contract rate of 10.25% as not clearly erroneous. *Id.* (N.B. Although the contract rate also takes into account the benefit of the bargain that was negotiated under the defaulted contract, this factor is not dispositive.)

Notably, the court of appeals did suggest that the rate might be too high, given that the comparable Treasury security rate was 6.45%. *Id.* However, the Fifth Circuit held that the lower court could not be reversed in finding that the appropriate risk premium in that case could be as high 3.75% *Id.* Since, in the instant case, the "loan" that FSA must make under the plan has a debt-to-value ratio of about 100%, the bankruptcy court is rationally supported by fact and logic in finding a risk premium over the Treasury rate (6.35%) of 5.15%.

K. "Whether the bankruptcy court erred by confirming the debtor's plan without a further hearing after denying confirmation of its plan in its order dated March 27, 1995?"

██ The plan, as of March 27, 1995, was not confirmed. The court denied confirmation conditionally on the debtor's changing of the wording of Section X.2 of the plan. X.2 intends to release the debtor from all pre-confirmation liabilities. This type of release is valid under § 1141(d)(1) of the Code. The court believed the language of X.2 was overly broad and ambiguous. The debtor agreed to delete said Section if the court so directed. The court felt that the Section was not essential to the plan, and finally confirmed the plan after the deletion.

Since the plan remained unconfirmed until the debtor filed the proposed modifications (the most material of which was that mentioned above,) the court had no duty to hold a new hearing under 11 U.S.C. § 1127. Prior to confirmation, a debtor may modify a plan in any way, and said modified plan becomes the plan of reorganization. 11 U.S.C. § 1127(a) After confirmation, modification requires notice and hearing. 11 U.S.C. § 1127(b) The situation here is slightly different than that actually contemplated by § 1127, however, in that while the plan was

not technically confirmed, the hearing on that confirmation had already occurred prior to the modification. Logically, it may seem that after denial, a debtor introducing any plan, even a modified one, must begin the process again, and a hearing would be required. But, a recent case addressed similar facts and found (as this court finds) that a bankruptcy court may condition confirmation on a modification that would address a narrowly tailored objection of the confirmation hearing without requiring a new hearing. *In re Walker*, 165 B.R. 994 (E.D.Va.1994.) The crucial issue is whether the modifications so alter the plan as to call in § 1127's requirement of notice and hearing. The modifications in this case were either inconsequential or a direct outgrowth of issues raised in the confirmation hearing and addressed in the court's opinion. The bankruptcy court held that these changes did not substantially alter the plan. Since the plan is, in essence, the same plan and not a new, modified plan, no new hearing is required.

Furthermore, there does not seem to be any constitutional "due process" reasons for a hearing either. No loss of liberty or property results from the changes in the plan. Any such issues were properly disposed of at the original hearing, and the changes in the plan do not change any of those considerations.

L. The final issues of FSA's appeal ask this court to overrule the bankruptcy court's ruling on the motion for rehearing or new trial and the bankruptcy court's confirmation of the plan. By disposing of all of FSA's specific arguments and issues, this court therefore disposes of these catch-all appeals.

III. TREATMENT OF CROSS–APPELLANT'S (TH–NOLP) ISSUES ON APPEAL

A. "Did the bankruptcy judge err in ordering the Debtor to make post-petition, pre-confirmation payments of interest to FSA while FSA appeals the order confirming the Debtor's plan of reorganization?"

While TH–NOLP makes noteworthy and substantial arguments as to this issue, they fail to address the standing issue raised by FSA in its reply brief. The order which forces TH–NOLP to make these payments issued from the bankruptcy court in 1992. TH–NOLP appealed the order at that time, and the appeal failed. The creditor is therefore estopped from appealing that issue and order again.

Even if the issue could be properly addressed, this court would be wary of ruling for the cross-appellant. Many of the assumptions upon which the plan and the bankruptcy court's confirmation of that plan rest on the fact that TH–NOLP has made these payments. For example, without these payments, FSA's claim would be nearly $5 million higher than its current level. This could affect the question of feasibility as well as issues of fairness and equity. Notions of judicial economy do not favor rehashing an estopped issue that is the basis of much of the bankruptcy court's later work.

B. The cross-appellant's second issue on appeal, concerning the cram down interest rate, is discussed in depth at Subsection II–J, *supra.*

C. "Did the bankruptcy judge err in denying the Debtor's Motion to Modify Amended Chapter 11 plan as modified prior to confirmation?"

The debtor suggests that, after the confirmation hearing, the court below should have allowed it to alter the provisions regarding the effective date of the plan so that it would take effect even if FSA appealed the confirmation. As discussed in section II–K, § 1127 requires a notice and hearing if the plan is to be altered substantially from its confirmed form. TH–NOLP could have modified the plan thusly prior to confirmation, but refused to do so. Presumably, and as FSA points out in its reply brief, the cross-appellant refused to do so in fear that another hearing would have been ordered, which could have resulted in a new valuation of the property and FSA's claim. If FSA were found to be oversecured at that point, TH–NOLP could be found liable for pre-

confirmation interest on the claim, up to the total value of the Hotel. This would have made TH–NOLP's payments to FSA under the existing cash-collateral order apply to interest, instead of principal. FSA's claim would therefore cease to decline, and the amount would be higher than the value of the Hotel at the confirmation hearing.

The cross-appellant now seeks to modify the plan so that it would become effective regardless of any appeal taken by FSA. This modification would be in direct contradiction of the plan's current effective date clause. Currently, the plan would not become effective until the confirmation order became final, that is, when said order could no longer be appealed. This clause, although allowing TH–NOLP to avoid repayment until a later date, actually may favor FSA because it allows the appellant to effectively stay the plan by appealing without putting up any bond that might otherwise be required by such an appeal were the plan to become effective during such an appeal. And, FSA is protected during this stay by the continuing payments by TH–NOLP under the cash-collateral order.

This court believes that this change would be a substantial alteration and modification of the plan as confirmed. If such modification were to be made, a new hearing would be required. The bankruptcy court realized this and refused to belatedly modify a plan that had already been confirmed (at least conditionally.) The modification is for the benefit of the debtor. If the debtor had wanted such a plan, it should have proposed it as such originally. This court cannot now let the debtor substantially modify the confirmed plan.

Accordingly, and for the foregoing reasons,

IT IS ORDERED that the appeals of both Financial Security Assurance, Inc., appellant, and T–H New Orleans Limited Partnership, cross-appellant, are OVERRULED.

### JUDGMENT

Considering the record, and for the reasons this date assigned,

IT IS ORDERED, ADJUDGED AND DECREED that both the appeals of Finan-

cial Security Assurance, Inc., and of T–H New Orleans Limited Partnership be OVERRULED and that the orders of the bankruptcy court, *sub judice*, be AFFIRMED.