**In re Antoinette DE LA FUENTE, and Lenord De La Fuente, Debtor.**

**Antoinette De La Fuente, and Lenord De La Fuente, Plaintiffs,**

v.

**Wells Fargo Bank, N.A., Defendant.**

**Bankruptcy No. 03–43483–H4–13. Adversary No. 08–03291.**

United States Bankruptcy Court, S.D. Texas, Houston Division.

May 18, 2010.

Miriam Trubek Goott, Walker Patterson PC, Houston, TX, for Plaintiffs.

John Harlan Ely, Ewing Jones PLLC, Houston, TX, for Defendant.

## MEMORANDUM OPINION ON DEBTORS' MOTION FOR AN ORDER OF CIVIL CONTEMPT AGAINST WELLS FARGO BANK, N.A.

JEFF BOHM, Bankruptcy Judge.

### I. INTRODUCTION

This adversary proceeding involves a sad and frustrating tale of how two successfully reorganized debtors unsuccessfully attempted to deal directly with their home lender, Wells Fargo Bank, N.A. (Wells Fargo). Their communications concerned the proper amounts that they owe Wells Fargo pursuant to certain orders of this Court entered during their Chapter 13 case. Only when their efforts at direct dialogue failed did the debtors turn to their counsel for assistance. This assistance first came through the filing of the above referenced adversary proceeding. Second, it came through the filing of a motion for contempt (the Motion for Contempt) when Wells Fargo failed to correct the debtors' loan records pursuant to an agreed judgment that it signed in order to settle the adversary proceeding and avoid a trial. This Memorandum Opinion discusses the reasons why this Court has decided to grant the Motion for Contempt.

### II. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Background of this Chapter 13 Case

On September 9, 2003, Antoinette De La Fuente and Lenord De La Fuente (the De La Fuentes) filed a Chapter 13 petition, primarily to save their homestead from foreclosure. [Main Case Doc. No. 1]; see [Adv. Doc. No. 1, ¶ 5]. Lenord works as a mechanic. [Main Case Doc. No. 24, Amended Schedule I]. Antoinette raises their two sons. [Main Case Doc. No. 37, Amended Schedule I]. In many ways, the De La Fuentes represent the American nuclear family, fallen on hard times, and desperately trying to hold on to their piece of the American dream.

And, indeed, in order to keep their home, the De La Fuentes dutifully proposed a plan which called for sixty monthly payments to the Chapter 13 Trustee (the Trustee), who would then make distributions to their creditors, including their home lender.[1] [Main Case Doc. Nos. 40,

---

1. The initial lender on the De La Fuentes' home was Washington Mutual Bank, F.A. [Proof of Claim Register, Claim No. 1]. However, Wells Fargo took an assignment of this

51 & 52]. On June 14, 2004, the Court entered an Order Confirming the De La Fuentes' Chapter 13 plan (the Confirmation Order).[2] Pursuant to the Confirmation Order, the De La Fuentes were required to make monthly payments to the Trustee, who, in turn, would disburse monies to their creditors, including Wells Fargo. The disbursements made to Wells Fargo were only for arrearages—*i.e.*, the amount in default as of the date of the filing of the Chapter 13 petition. Under the Confirmation Order, the De La Fuentes themselves were required to make all regular monthly payments which became due after the petition's filing. Stated differently, the Trustee was the disbursing agent solely for amounts that were due pre-petition, and not for any amounts that became due post-petition.[3]

The De La Fuentes did in fact begin making payments in 2004, pursuant to the Confirmation Order, and continued to do so for the next five years; their plan ended successfully upon them making their sixtieth payment to the Trustee in 2009. During this five-year period, the Trustee distributed to Wells Fargo the amount of $5,349.19,[4] representing the arrearages owed under the Confirmation Order. And, after the De La Fuentes finished making all of their required payments under the Confirmation Order, this Court issued its order discharging the De La Fuentes. [Main Case Doc. No. 106].

Overall, the record reflects that the De La Fuentes were model Chapter 13 debtors. They filed their petition, obtained confirmation of their plan, and made all of their payments pursuant to their plan. Thus, they achieved the twin objectives of the bankruptcy process: they received a discharge; and their creditors, including Wells Fargo, received payment on their allowed claims. *See In re Lots by Murphy, Inc.*, 2010 WL 1169785, *3–4, 2010 Bankr.LEXIS 873, at *10–11 (Bankr. S.D.Tex.2010) ("[T]he twin pillars of bankruptcy are: (1) the discharge of the debtor, in order to obtain a 'fresh start'; and (2) the satisfaction of valid claims against the estate.") (citing *Fin. Sec. Assur. v. T–H New Orleans Ltd. P'ship (In re T–H*

---

claim on June 27, 2007. [Main Case Doc. No. 61]. Hereinafter, whenever reference is made to the Chapter 13 Trustee having made payments to Wells Fargo, the Court intends the reference to include payments made not only to Wells Fargo, but also Washington Mutual Bank, F.A.

**2.** Hereinafter, reference to "the Confirmation Order" refers to: (1) the order confirming the plan proposed by the De La Fuentes, and the language contained therein [Main Case Doc. No. 52]; (2) the Chapter 13 plan, and the terms and conditions set forth therein [Main Case Doc. No. 40]; and (3) the Summary and Analysis of Chapter 13 Plan [Main Case Doc. No. 51].

**3.** The practice of allowing debtors (as opposed to the Trustee) to make post-petition payments to home lenders is, with certain exceptions, no longer allowed in the Southern District of Texas. Rather, the Trustee now makes all distributions (both for amounts

owed pre-petition and that come due post-petition). Debtors therefore need only worry about making one complete payment each month to one person—the Trustee—and the Trustee then has the responsibility to distribute the correct amount of funds to the appropriate creditors, including home lenders. *See Perez v. Peake (In re Perez)*, 339 B.R. 385, 414–17 (Bankr.S.D.Tex.2006) (*aff'd Perez v. Peake (In re Perez)*, 373 B.R. 468, 493 (S.D.Tex. 2007)).

**4.** That the Trustee actually distributed this amount to Wells Fargo is reflected in the Trustee's Final Report and Account filed on September 21, 2009. [Main Case Doc. No. 109]. This amount is the amount claimed by the original holder of the debt and lien, Washington Mutual Bank, F.A., when it filed its proof of claim on October 15, 2003. As already noted in footnote 1, Wells Fargo took an assignment of Washington Mutual's claim in June of 2007.

*New Orleans Ltd. P'ship*), 188 B.R. 799, 807 (E.D.La.1995) *aff'd* 116 F.3d 790 (5th Cir.1997)).

## B. Wells Fargo's involvement with the De La Fuentes

On June 27, 2007, Wells Fargo acquired the De La Fuentes' homestead loan from Washington Mutual Bank, F.A. [Main Case Doc. No. 61]. In January of 2008, the De La Fuentes were dutifully fulfilling their obligations under the Confirmation Order (including remitting their regular monthly payments to Wells Fargo in addition to sending their monthly payments to the Trustee, who was then distributing monies to Wells Fargo to cure the arrearage). Nevertheless, Wells Fargo sent the De La Fuentes a letter accusing them of being delinquent on their loan by $8,400.06. [Adv. Doc. No. 1, ¶ 18].[5] The letter threatened that unless the De La Fuentes became current with their payments by February 14, 2008, Wells Fargo would foreclose on their homestead.[6] Knowing that the allegations in Wells Fargo's letter were incorrect, the De La Fuentes directly contacted Wells Fargo and attempted to correct the mistake. [Adv. Doc. No. 1,¶ 19]. Nevertheless, Wells Fargo insisted, and the De La Fuentes, out of fear of losing their home, entered into a temporary forbearance agreement [Wells Fargo Ex. Nos. 5 & 6] and loan modification agreement in lieu of foreclosure on April 10, 2008.[7] [Adv. Doc.

---

5. Paragraph 18 of the Complaint filed by the De La Fuentes to initiate the pending adversary proceeding sets forth in detail that they received this demand letter from Wells Fargo. Yet, in the Original Answer that Wells Fargo filed, Wells Fargo states that it "is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 18." [Adv. Doc. No. 6, Para. 18]. This statement strains credulity considering that Wells Fargo introduced the January 15 demand letter as one of its own exhibits at the pre-trial conference held in this adversary proceeding on April 16, 2009. [Wells Fargo Exhibit No. 7]. Wells Fargo, in filing a responsive pleading, has a duty of good faith in averring that it does not have sufficient information or knowledge to admit or deny an allegation. *Djourabchi v. Self*, 240 F.R.D. 5, 11–12 (D.D.C.2006) ("[A] party 'may not deny sufficient information or knowledge with impunity, but is subject to the requirements of honesty in pleading. An averment will be deemed admitted when the matter is obviously one as to which a defendant has knowledge or information.' Moreover, a party 'may be held to the duty to exert a reasonable effort to obtain knowledge of a fact.' " (internal citations omitted)). Because a copy of the January 15 demand letter was clearly in Wells Fargo's possession, this Court believes Wells Fargo should have been more diligent in checking its records before filing the Original Answer. Its failure to be more attentive is symptomatic of how Wells Fargo has handled the De La Fuentes' loan, as is discussed in the remainder of this Memorandum Opinion.

6. The letter was not sent to bankruptcy counsel for the De La Fuentes, and the De La Fuentes felt no need at that point in time to re-engage their bankruptcy counsel or any other attorney—no doubt because of their quite legitimate desire to try to resolve problems with Wells Fargo themselves and avoid incurring additional attorneys' fees.

7. The temporary forbearance agreement (the Temporary Forbearance Agreement) and loan modification agreement (the Loan Modification Agreement) are Exhibits 5 & 6 that this Court admitted at the pre-trial conference on April 16, 2009.

The Temporary Forbearance Agreement stated that the De La Fuentes must pay the following amounts on the following dates: $2,748.86 on 1/29/2008, $960.49 on 2/24/2008, $960.49 on 3/24/2008, $960.49 on 4/24/2008, and $6,516.92 on 5/24/2008. Pursuant to the Temporary Forbearance Agreement, the De La Fuentes paid Wells Fargo $2,748.86 on 1/17/2008 (although the Complaint states that the De La Fuentes did not receive the Temporary Forbearance Agreement until January 30, it appears that some oral agreement was reached prior to that date), $960.49 on 2/19/2008 (plus a $20.00 phone fee), and $960.49 on 3/21/2008 (plus a $20.00 phone fee). Before making the April,

No. 1, ¶ 20]. This was in spite of the fact that the pre-petition mortgage arrears were already provided for in the Confirmation Order and, therefore, could not be collected in a different manner or time frame than set forth in the Confirmation Order without this Court's approval. Wells Fargo's actions therefore violated the Confirmation Order. Wells Fargo knew the De La Fuentes were Chapter 13 debtors and that both they and Wells Fargo were bound by the Confirmation Order; yet, Wells Fargo frightened the De La Fuentes into making payments to Wells Fargo in violation of the Confirmation Order.

## C. The history of the pending adversary proceeding

In June of 2008, approximately two months after entering into the Loan Modification Agreement and the Temporary Forbearance Agreement, the De La Fuentes decided to retain the law firm of Walker & Patterson, P.C. (W & P) to represent them in the main case after the Trustee took the position that they needed to modify the Plan. [Main Case Doc. No. 65]. W & P had not been initial counsel of record for the De La Fuentes, but the firm undertook the representation and resolved this matter with the Trustee, plus other matters relating to their Chapter 13 case. [Main Case Doc. Nos.79, 81, & 96]. At some point after W & P began its representation of the De La Fuentes in the main case, the De La Fuentes reviewed with W & P the communications that they had exchanged with Wells Fargo and provided W & P with copies of the Loan

Modification Agreement and the Temporary Forbearance Agreement. As a result of communications between the De La Fuentes and W & P, the former authorized the latter to file suit against Wells Fargo. Accordingly, on August 13, 2008, the De La Fuentes filed the Complaint initiating the instant adversary proceeding against Wells Fargo (the Adversary Proceeding), alleging willful violation of the automatic stay and violation of the Confirmation Order. [Adv. Doc. No. 1]. On September 19, 2008, Wells Fargo filed an Original Answer, primarily denying the De La Fuentes' allegations, and praying that the Court deny the relief sought by the De La Fuentes. [Adv. Doc. No. 6]. This Court issued a scheduling order, which set discovery deadlines, a pre-trial conference for April 16, 2009, and a trial date for the week of April 20, 2009. [Adv. Doc. No. 2]. Thereafter, the parties conducted discovery and filed their respective pre-trial statements. [Adv. Doc. Nos. 10 & 11]. At the pre-trial conference on April 16, 2009, the parties announced that they were ready for trial, and this Court set the trial date for April 21, 2009.

## D. The first "Settlement Agreement"

On April 21, 2009, this Court called the Adversary Proceeding for trial. At that time, counsel for both parties announced that they were in the process of negotiating a global settlement. Counsel for the parties then recited into the record those terms upon which they had reached agreement. While counsel for the De La Fuentes stated that the parties had reached agreement on many terms, he not-

2008 payment of $960.49, the De La Fuentes received a phone call from a Wells Fargo representative stating that because they had timely made three consecutive payments pursuant to the Temporary Forbearance Agreement, the De La Fuentes now qualified for a loan modification and that if they paid

$1,871.00, they would not have to make the $6,516 payment due for May 2008. In the same conversation, the De La Fuentes paid $960.00 (plus a $20.00 phone fee) and paid the remaining balance of $911.62 (plus a $20.00 phone fee) on May 2, 2008. [Adv. Doc. No. 1].

ed that there were two material points over which the parties had yet to reach agreement: the amount of the De La Fuentes' attorneys' fees to be paid by Wells Fargo for prosecuting the Adversary Proceeding and the amount of the monthly escrow payment to be paid in the future.[8] Counsel for both parties asked the Court to conduct an immediate trial on the amount of attorneys' fees; and counsel for each party stated that they would confer thereafter in an effort to reach an agreement on the specific amount of the escrow payment. *See* [Tape Recording, April 21, 2009 Trial at 9:22:03 am.–9:25:00 a.m.; 10:35:04 a.m–10:36:06 a.m.].

The Court then heard testimony on the amount of attorneys' fees, and issued an oral ruling from the bench awarding reasonable attorneys' fees to the De La Fuentes in the amount of $25,895.00. The Court then requested counsel for both parties to submit an agreed judgment in writing within one week and reminded them that this judgment needed to include not only the agreed terms announced into the record, but also the fee award and the escrow amount that the parties were to agree upon after further consultation. [Tape Recording, April 21, 2009 Trial, 10:35:04 am–10:36:07 a.m.].

Unfortunately, the parties thereafter failed to reach an agreement on the escrow amount. Not surprisingly, counsel never submitted a signed, written agreed judgment to this Court. However, on June 10, 2009, Wells Fargo unilaterally filed a Motion for Entry of Final Judgment [Adv. Doc. No. 12] requesting that this Court sign an order approving: (1) those terms announced into the record at the April 21, 2009 hearing; (2) attorneys' fees to the De La Fuentes in the amount of $25,895.00 (*i.e.,* the amount decided upon by this Court at the April 21 trial); and (3) the monthly escrow amount desired by Wells Fargo but which the De La Fuentes would not voluntarily accept.

On July 20, 2009, this Court issued an order denying Wells Fargo's motion and a Memorandum Opinion explaining the reasons for its decision.[9] [Main Case Doc. Nos. 18 & 19]. In its order denying Wells Fargo's motion, the Court also set trial for July 28, 2009. Moreover, the Court expressly stated in this order that any future negotiated settlement must be reduced to writing in the form of an agreed judgement and signed by all counsel of record. [Main Case Doc. No. 19]. In short, the Court was telegraphing to the parties that if they were going to resolve their dispute,

---

8. The phrase "escrow payment" encompasses two categories: insurance costs and taxes.

9. In its Memorandum Opinion on Wells Fargo's Motion for Entry of Final Judgment, this Court denied Wells Fargo's Motion on two bases. First, even if could be said that the parties did come to an agreement that was articulated by the oral announcement during the hearing of April 21, 2009, such agreement was not enforceable under the Texas statute of frauds. *See* Tex. Bus. & Comm.Code Ann. § 16.01(b)(4); *West v. First Baptist Church of Taft,* 123 Tex. 388, 71 S.W.2d 1090, 1100 (1934); *Khoshnoudi v. Bird,* No. 05–98–00388–CV, 2000 WL 1176587, at *5 (Tex. App.-Dallas 2000, no pet) (citing *West,* 71 S.W.2d at 1100); *see also Edward Scharf As-*

socs., *Inc. v. Skiba,* 538 S.W.2d 501, 502 (Tex. Civ.App.-Waco 1976, no writ). Second, an agreement will not be enforced when parties include a condition precedent and then subsequently fail to meet that condition. *See Valley Ranch Dev. Co. v. F.D.I.C.,* 960 F.2d 550, 553 (5th Cir.1992). Here, the De La Fuentes and Wells Fargo never reached agreement on a material term—namely, the amount of the monthly escrow. Accordingly, as this Court stated in the Memorandum Opinion: "Because the parties have failed to agree on the amount of the monthly escrow payment, the condition precedent has not been satisfied. The Court, therefore, will not grant the Motion for Entry of Final Judgment." [Adv. Doc. No. 18].

they really needed to focus on **all** of the terms and reduce **all** of those terms to writing so that there would be absolutely no room for misunderstanding about what the duties and obligations of the parties were in any settlement.

### E. The second "Settlement Agreement"

On July 27, 2009, the day before trial, the parties entered into and filed an Agreed Final Judgment (the Agreed Judgment). The Agreed Judgment represented the parties' second attempt at settlement, but this time, all of the terms were reduced to writing and signed by counsel for both parties. Upon submission, this Court reviewed and signed the Agreed Judgment, which expressly ordered that: (1) the De La Fuentes' loan serviced by Wells Fargo was deemed to be contractually current through April 2009, with the next monthly mortgage payment due in May 2009; (2) the principal balance of the De La Fuentes' loan immediately prior to the posting and application of the De La Fuentes' May 2009 loan payment was deemed to be $66,572.80; (3) the De La Fuentes' monthly principal and interest payment is $551.69 and shall remain the same until the last scheduled payment, which is April 1, 2029; (4) all future monthly payments of principal and interest shall be applied as reflected on Exhibit A; [10] (5) the De La Fuentes' escrow account shall show a positive balance of $1,700.00 as of April 31, 2009; [11] (6) until the next scheduled escrow analysis, the De La Fuentes shall pay, in addition to the principal and interest payment, $410.24 per month to be applied to their escrow account; (7) the De La Fuentes' loan shall show no outstanding fees, costs, charges or corporate advances as of April 31, 2009; [12] (8) to the extent Wells Fargo is required to make correcting entries on the De La Fuentes' loan records to reflect the amounts set out in the Agreed Judgment, such correcting entries shall be completed within 30 days from the entry on the docket of this Agreed Judgment (i.e., by August 26, 2009); [13] (9) nothing in the Agreed Judgment shall affect the special escrow account held by Wells Fargo which contains insurance proceeds paid as the result of damages to the homestead of the De La Fuentes; and (10) Wells Fargo shall pay the De La Fuentes' attorneys, Walker & Patterson, P.C., the reasonable fees and costs for prosecuting the Adversary Proceeding in the amount of $30,895.00, with such payment to be made within 10 days of the entry of the Agreed Judgment. [Adv. Doc. No. 23].

Having entered into the Agreed Judgment, the De La Fuentes believed, among other things, that all of their concerns over

---

10. Exhibit A to the Agreed Judgment is an amortization schedule indicating the outstanding principal balance and amounts of principal and interest to be paid for each month through April 1, 2029 (which is when the last monthly payment is to be paid by the De La Fuentes). There is little doubt that Exhibit A is attached to the Agreed Judgment so that there would be absolutely no ambiguity about how much the monthly principal and interest payment would be, and how this amount would be applied against the balance owed under the loan.

11. The parties mistakenly had a typographical error in the Agreed Judgment referencing April 31, 2009, when it is common knowledge that April has only 30 days. At the time the Court signed the Agreed Judgment, it construed the reference to April 31 to really be April 30.

12. *See* footnote no. 11.

13. The Agreed Judgment was entered on the docket on July 27, 2009. Therefore, Wells Fargo had thirty (30) days from this date—i.e., by August 26, 2009—to make the correcting entries.

the inaccuracies of their loan records at Wells Fargo had been put to rest. In the words of Ms. De La Fuente: "When the settlement came through, and we got the final judgment from the Court and everything, I called your office [*i.e.*, her attorney's office]. And we were happy and pleased." [Feb. 9, 2010 Tr. 11:2–4]. Unfortunately, the De La Fuentes' sense of closure was misplaced.

## F. Discovery by the De La Fuentes of Wells Fargo's failure to comply with the Agreed Judgment

The De La Fuentes first discovered that Wells Fargo was violating the Agreed Judgment when they received the Monthly Mortgage Statement dated 11/13/09. [Exhibit No. 2]. This Statement incorrectly reflected, among other things, that the unpaid principal balance of the loan was $70,938.84 [Exhibit No. 2]; it should have reflected that the unpaid principal balance was $65,753.16 pursuant to the Agreed Judgment. [Exhibit No. 1]. Thereafter, according to W & P's timesheets, Ms. De La Fuente met with Miriam Goott (Goott), an attorney at W & P, on November 18, 2009. [Exhibit No. 5]. The time sheets reflect that on November 22, 2009 and December 7, 2009, Goott worked on a draft of a motion for contempt. However, no motion for contempt was filed in December of 2009.

In January of 2010, Ms. De La Fuente went online to make the monthly payment to Wells Fargo. [Feb. 9, 2010 Tr. 7:10–14]. However, she was unable to make this online payment because when she hit the appropriate key on her computer to make the payment, her computer screen told her that she had to call Wells Fargo because of the status of her account. [Feb. 9, 2010 Tr. 7:15–18]. She therefore

called Wells Fargo, and as she was on the phone, she noticed that the balance of the loan appearing on the screen had increased [Feb. 9, 2010 Tr. 7:19–21], a fact which surprised her because her husband and she had made all of the payments since May of 2009. [Feb. 9, 2010 Tr. 7:10–11]. She also noticed that the screen reflected that Wells Fargo had reversed several of the payments that her husband and she had made since May of 2009. [Feb. 9, 2010 Tr. 7:20–22]. She inquired about the payment reversals, and the Wells Fargo employee with whom she was speaking told her that "it was a computer glitch and that they would fix it. Give it a couple of days." [Feb. 9, 2010 Tr. 12:11–12]. And, indeed, the De La Fuentes waited a couple of days for Wells Fargo to correct both the payment reversals and the balance of the loan. Unfortunately, Wells Fargo failed to make these corrections; in fact, the balance had increased even further. [Feb. 9, 2010 Tr. 12:13–16].

Thereafter, still in January, Ms. De La Fuente once again tried to make a payment online, and was prevented from doing so. [Feb. 9, 2010 Tr. 14:21–22]. She, once again, called Wells Fargo "[a]nd that's when they told me that I had been put in bankruptcy status, and that I needed to make my loan current. And they wanted me to pay more than what I wanted to pay, that was my monthly payment. And I didn't want to pay more, because I didn't owe more than that." [Feb. 9, 2010 Tr. 14:24–15:3]. Thus, in the eyes of the De La Fuentes, Wells Fargo continued to violate the Agreed Judgment because, among other things, the balance on their loan still did not track with what the balance of the loan should be pursuant to the amortization schedule attached to the Agreed Judgment.[14] Stated differently,

14. Although Wells Fargo was in violation of the Agreed Judgment in various respects, one

the De La Fuentes were now painfully aware that Wells Fargo had not corrected the entries in its internal records as required by the Agreed Judgment.

### G. The filing of the Motion For Contempt

The De La Fuentes authorized W & P to file the Motion for Contempt, which was done on January 18, 2010. [Adv. Doc. No. 26]; [Exhibit No. 5]. On January 21, 2010, this Court, through the Office of the Clerk of Court, docketed a notice that the hearing for the Motion for Contempt would be held on February 9, 2010. [Adv. Doc. No. 27]. On January 22, 2010, counsel for the De La Fuentes sent notice of this hearing to counsel for Wells Fargo. [Adv. Doc. No. 29]. However, Wells Fargo did **not** file a written response to the Motion for Contempt. Instead, Wells Fargo chose to simply appear at the hearing and defend itself.

### H. The hearing on the Motion for Contempt

*1. The February 9, 2010 part of the hearing (the February 9 Hearing)*

The hearing on the Motion for Contempt began on February 9, 2010. On this day,

Ms. De La Fuente testified, and she did so very credibly.[15] Her testimony revealed that Wells Fargo was not in compliance with the Agreed Judgment in several respects.

First, Ms. De La Fuente testified about Exhibit No. 2. She noted that this Exhibit was the Monthly Mortgage Statement dated 11/13/09 that her husband and she had received from Wells Fargo. This statement sets forth that the unpaid principal balance is $70,938.84. She emphasized that this figure does not track with the language of the Agreed Judgment. The Agreed Judgment sets forth that the principal balance "immediately prior to the posting and application of the Plaintiffs' [*i.e.*, the De La Fuentes'] May, 2009 loan payment is $66,572.80." She also testified that her husband and she had made all of their monthly payments to Wells Fargo since May of 2009 [Feb. 9, 2010 Tr. 7:10–11]. Thus, there is no way that in November of 2009, the unpaid principal balance could be $70,938.84. The unpaid principal balance as of 11/13/09 would have to be in an amount less than the figure of $66,572.80 for May of 2009 set forth in the Agreed Judgment. And, indeed, a review of Exhibit A to the Agreed Judgment—

of the provisions with which it did timely comply was that it made payment of the $30,895.00 in attorneys' fees that the De La Fuentes had incurred.

**15.** In addition to adducing testimony from Ms. De La Fuente, counsel for the De La Fuentes introduced into the record six exhibits. This Court admitted the first four exhibits at the February 9 Hearing, and the two other exhibits (*i.e.*, Exhibit Nos. 5 & 6) were admitted at the February 23, 2010 hearing. Exhibit No. 1 is the Agreed Judgment; Exhibit No. 2 is the Monthly Mortgage Statement dated 11/13/09 that the De La Fuentes received from Wells Fargo; Exhibit No. 3 is the Business Online Account Activity maintained by Wells Fargo on the De La Fuentes' account showing entries made from 08/04/09 through

01/19/10; Exhibit No. 4 is the Business Online Account Activity maintained by Wells Fargo on the De La Fuentes' account showing entries made from 08/10/09 through 02/05/10; Exhibit No. 5 is the Invoice dated 02/22/10 from counsel for the De La Fuentes to the De La Fuentes for services rendered in connection with the prosecution for the Motion for Contempt; and Exhibit No. 6 is the Business Online Account Activity maintained by Wells Fargo on the De La Fuentes' account showing entries made from 01/05/10 through 02/05/10. With respect to Exhibit 5, the Court expressly did not admit certain hearsay statements within that exhibit; rather, the exhibits were admitted for the purpose of proving up the reasonableness of the attorneys' fees incurred by the De La Fuentes.

which sets forth the amortization schedule to be used for the remaining life of the loan—indicates that, as of 11/01/2009, the unpaid principal balance is \$65,753.16, which is an amount less than \$66,572.80. Thus, as of the February 9 Hearing, Wells Fargo was not in compliance with the Agreed Judgment because the 11/13/09 Monthly Mortgage Statement which it sent to the De La Fuentes overstated the unpaid principal balance by \$5,185.68 (*i.e.*, \$70,938.84—\$65,753.16 = \$5,185.68).

Second, Ms. De La Fuente testified about Exhibit No. 3. She stated that she found this page online in January 2010 when she looked up her mortgage account on the "Wells Fargo Business Online" website [Feb. 9, 2010 Tr. 9:15–21]. This document represents that the last payment received from the De La Fuentes was on 12/30/09. That is the good news; it is an accurate representation. Unfortunately, the bad news is that this document reflects that the outstanding principal balance is \$71,337.82. Thus, Wells Fargo was not in compliance with the Agreed Judgment because this document reflects that the unpaid principal balance is not \$65,632.98 (as set forth in the agreed upon amortization schedule attached to the Agreed Judgment), but rather \$71,337.82—which means that this document overstates the unpaid principal balance by \$5,704.84 (*i.e.*, \$71,-337.82—\$65,632.98 = \$5,704.84). Further, even though the De La Fuentes had made their November and December 2009 payments, Wells Fargo's records reflect that the unpaid principal balance rose from \$70,938.84 (*i.e.*, the incorrect figure set forth in the Monthly Mortgage Statement of 11/13/09) to \$71,337.82 (*i.e.*, the incorrect figure set forth in the Business Online Account Activity from January of 2010). Stated differently, Wells Fargo's internal system increased the principal balance even when the De La Fuentes made timely payments.

But there is more. The online statement marked as Exhibit No. 3 contains a line that reads as follows: "Total amount due to make loan current: \$8,934.72." Not surprisingly, Ms. De La Fuente testified that this representation was wrong. She was very clear in stating that her husband and she were current on the loan. [Feb. 9, 2010 Tr. 9:24–10:8]. This Court agrees. Because: (a) the Agreed Judgment expressly stated that the De La Fuentes' loan was contractually current through April 2009; (b) the De La Fuentes had made all of their regular monthly payments to Wells Fargo since May of 2009 [Feb. 9, 2010 Tr. 7:10–11]; (c) the Agreed Judgment had been entered on the docket and become a final order [Adv. Doc. No. 24]; and (d) the Trustee had paid to Wells Fargo the entire arrearage of \$5,349.19 pursuant to the Confirmation Order [Main Case Doc. No. 109], there is no way that the De La Fuentes needed to pay \$8,934.72 to bring their loan current. They were current! Thus, Wells Fargo was not in compliance with the Agreed Judgment because according to the terms of the Agreed Judgment, the De La Fuentes were current through April of 2009; and given that they had made all of their payments from May of 2009 and thereafter—a fact, it should be noted, that Wells Fargo does not dispute—there is no way that the De La Fuentes needed to pay \$8,934.72 to bring their loan current. The information in Wells Fargo's Business Online Account Activity therefore contradicted the representations that Wells Fargo gave to the De La Fuentes and to this Court in the Agreed Judgment.

Ms. De La Fuente's testimony about Exhibit No. 4 tracks with her testimony about Exhibit No. 3. She stated that she found Exhibit No. 4 online in February 2010 when she looked up her mortgage account on the Wells Fargo Business On-

line website [Feb. 9, 2010 Tr. 10:9–16]. This document reflects that the last payment received from the De La Fuentes was on 01/29/10. Once again, that is the good news; it is an accurate representation. Unfortunately, the bad news is that this document, just like Exhibit No. 3, reflects that the outstanding principal balance is a number different from what it should be based upon the agreed amortization schedule attached to the Agreed Judgment. According to that amortization schedule, the outstanding principal balance—assuming that the De La Fuentes have made all of their payments through January of 2010, which they have—is $65,390.24. Yet, Exhibit No. 4, which Ms. De La Fuente printed off of the Wells Fargo Business Online website within 24 hours of the February 9 Hearing, reflects that the outstanding principal balance is $66,572.80. In other words, the outstanding principal balance is shown to be $1,182.56 greater than what Wells Fargo agreed it should be in the Agreed Judgment.

Granted, the figure of $66,572.80 is the figure referenced in the Agreed Judgment as the outstanding principal balance, but the Agreed Judgment unequivocally sets forth that this figure is the principal balance immediately prior to the posting of the loan payment made by the De La Fuentes for May of 2009. The problem for Wells Fargo is that because the De La Fuentes had made their monthly payments for each month since May of 2009, the balance of $66,572.80 had decreased. Thus, Exhibit No. 4 demonstrates that Wells Fargo was not in compliance with the Agreed Judgment because the outstanding principal balance figure was overstated and did not match with the figure set forth in the amortization schedule attached to the Agreed Judgment (i.e., $65,390.24).[16]

But, once again, just as with Exhibit No. 3, there is more. The online statement marked as Exhibit No. 4 contains a line that reads as follows: "Total amount due to make loan current: $9,421.52." Not surprisingly, Ms. De La Fuente testified that this figure had increased from $8,934.72 (i.e., the number in Exhibit No. 3) to $9,421.52. [Feb. 9, 2010 Tr. 10:9–23]. As already noted, the De La Fuentes were current on their loan in February of 2010, just as they were current on their loan in January of 2010. Hence, there is no way that any document for which Wells Fargo is responsible should be showing that in February of 2010, the De La Fuentes needed to pay $9,421.52 to bring their loan current. What is particularly peculiar about the figure of $9,421.52 is that it represents an increase of $486.80 from January of 2010 to February of 2010, while, at the same time, the De La Fuentes were making timely monthly payments to Wells Fargo. Thus, Wells Fargo

---

**16.** At the February 9 Hearing, counsel for Wells Fargo, in cross examining Ms. De La Fuente, spent time adducing testimony from her during which she acknowledged that on Exhibit No. 4, the "[o]utstanding principal balance" is shown to be $66,572.80. Counsel for Wells Fargo then asked Ms. De La Fuente whether this figure is the balance "as per the judgement of this Court?" and she responded in the affirmative. [February 9, 2010, Tr. 16:4–6]. Counsel then inquired "[s]o does it appear to you that that adjustment has been made?" and she also responded in the affirmative. [February 9, 2010, Tr. 16:7–9]. To the extent that counsel for Wells Fargo was attempting to adduce testimony to convince this Court that Wells Fargo was in compliance with the Agreed Judgment, his attempt must fail. By February 9, 2010, according to Schedule A attached to the Agreed Judgment, the correct principal balance was $65,390.24, not $65,572.80. And, indeed, counsel for the De La Fuentes, on redirect examination of Ms. De La Fuente, adduced testimony from her on exactly this point. [February 9, 2010, Tr. 19:11–21:17].

was not in compliance with the Agreed Judgment because according to the terms of the Agreed Judgment, the De La Fuentes were current through April of 2009. Given that they had made all of their payments from May of 2009 and thereafter—another fact that Wells Fargo does not dispute—there is no way that the De La Fuentes needed to pay $9,421.52 to bring their loan current. The information in Wells Fargo's Business Online Account Activity therefore contradicted the representations that Wells Fargo gave to the De La Fuentes and to this Court in the Agreed Judgment.

After Ms. De La Fuente finished giving testimony, counsel for the De La Fuentes stated that they had no further witnesses to call in their case-in-chief on Wells Fargo's failure to comply with the Agreed Judgment. Counsel for Wells Fargo then informed the Court that Wells Fargo wanted to call one witness, but that this witness had been unable to fly to Houston due to inclement weather. The Court therefore agreed to continue the hearing until February 23, 2010, so that this witness could give testimony on behalf of Wells Fargo.

However, having heard the testimony of Ms. De La Fuente, and having reviewed the exhibits, this Court did make a finding that because the amortization table of the Agreed Judgment required the principal balance to be $65,390.24 as of February 1, 2010, and because Exhibit No. 4 (the Wells Fargo Business Online Account Activity) showed the balance to be $66,572.80, Wells Fargo was therefore in violation of the Agreed Judgment. [Feb. 9, 2010 Tr. 25:6–

26:16]. Citing *F.D.I.C. v. LeGrand*, this Court concluded that the De La Fuentes had met their burden in satisfying the three elements required to establish that Wells Fargo was in contempt of this Court's judgment—namely, the Agreed Judgment.[17] [Feb. 9, 2010 Tr. 26:10–15]; *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir.1995). The Court then stated that the burden now fell on Wells Fargo to demonstrate that it was unable to comply with the Agreed Judgment or that it had some other relevant defense. [Feb. 9, 2010 Tr. 26:17–19; 27:5–9]. The Court informed counsel for Wells Fargo that the Court would hear testimony from Wells Fargo's representative at the continued hearing to be held on February 23, 2010. [Feb. 9, 2010 Tr. 28:11].

Finally, because the Court concluded that Wells Fargo was in contempt of the Agreed Judgment due to the failure of Exhibit No. 4 to show that the principal balance was $65,390.24 (instead of $66,572.80), the Court issued an oral ruling that Wells Fargo would be liable to the Clerk of Court on a per diem basis in the amount of $1,182.56 for each day thereafter until the figure of $65,390.24 was showing as the principal balance.[18] [Feb. 9, 2010 Tr. 26:20–27:4]. The Court noted that upon hearing testimony from the Wells Fargo witness at the February 23, 2010 hearing, it would make a determination whether Wells Fargo had met its burden to establish that it could not comply with the Agreed Judgment and whether Wells Fargo would have to pay any amounts that accrued for each day that passed where the figure of $65,390.24 was

17. This conclusion was limited solely to the incorrect principal balance indicated in Wells Fargo's records. At the February 9 Hearing, the Court expressly noted that it was making no ruling on Wells Fargo's other alleged acts of contempt. [Feb. 9, 2010 Tr. 27:22–25].

18. The amount of $1,182.56 is the difference between what was actually appearing on Exhibit No. 4 (*i.e.*, $66,572.80) and what should have been showing on Exhibit No. 4 (*i.e.*, $65,390.24).

not showing as the principal balance. [Feb. 9, 2010 Tr. 27:10–13].

### 2. The February 23, 2010 part of the hearing (the February 23 Hearing)

On February 23, 2010, Wells Fargo presented its case in chief by calling one witness, John Grissom (Grissom), and by introducing two exhibits.[19] Additionally, the De La Fuentes recalled Ms. De La Fuente on rebuttal, and also adduced testimony from their counsel on the amount of attorneys' fees that they had incurred in prosecuting the Motion for Contempt.

#### i. Testimony of the Wells Fargo representative, John Grissom

Grissom identified himself as a senior counsel of Wells Fargo. [Feb. 23, 2010 Tr. 10:12–13]. He works out of a Wells Fargo office in Iowa. [Feb. 9, 2010 Tr. 1:12–13]. He stated that he directed his paralegal in July of 2009 to make the changes within Wells Fargo's system in accordance with the terms of the Agreed Judgment. [Feb. 23, 2010 Tr. 10:13–18]. He also admitted that the adjustments that his paralegal was supposed to make at that time included reducing the principal balance to the figure of $66,572.80. [Feb. 23, 2010 Tr. 10:19–21]. He then admitted that this particular adjustment was not done. [Feb. 23, 2010 Tr. 10:22–23]. When counsel for Wells Fargo asked Grissom why the adjustment was not made, Grissom responded: "This one was a mistake. It was one that fell through the cracks." [Feb. 23, 2010 Tr. 10:25–11:1]. Indeed, Grissom stated that he first learned that the adjustment had not been made when the Motion for Contempt was filed on January 18,

2010—almost six months after the entry of the Agreed Judgment on the docket, and almost five months after the deadline for Wells Fargo to make the adjustments pursuant to the Agreed Judgment. See [Feb. 23, 2010 Tr. 11:7–11]. Thus, Grissom, by his own testimony, confirmed that Wells Fargo was not in compliance with the Agreed Judgment. Counsel for Wells Fargo thereafter attempted to adduce testimony from Grissom to convince this Court that Wells Fargo did not have the ability to make the adjustment or, alternatively, that Wells Fargo had some other defense.

First, Grissom stated that once he learned about the filing of the Motion for Contempt, he "directed my paralegal to work with the information systems people to get this account corrected." [Feb. 23, 2010 Tr. 11:19–21]. According to Grissom, these personnel undertook this task and made the appropriate adjustments pursuant to the Agreed Judgment. [Feb. 23, 2010 Tr. 11:22–23; 14:10–23].

Second, Grissom asserted that if, prior to the filing of the Motion for Contempt, he had received notice about Wells Fargo's failure to comply with the Agreed Judgment, the adjustment would have been made earlier: "Oh, absolutely absolutely. If I'd received a call or an e-mail from you or anything, we would have taken care of getting this done much sooner." [Feb. 23, 2010 Tr. 15:17–19].

Third, Grissom emphasized that Wells Fargo's failure to make the adjustment in accordance with the Agreed Judgment by the thirty-day deadline set forth in that judgment (i.e., by August 26, 2009) was not

---

19. The two exhibits of Wells Fargo which this Court admitted were Exhibit A and Exhibit B. Exhibit A is a one-page document that is untitled but unquestionably contains information about the De La Fuentes' home loan as of

February 22, 2010. Exhibit B is a five-page document that is also untitled but unquestionably contains historical information about the De La Fuentes' home loan.

a willful failure on Wells Fargo's part. [Feb. 23, 2010 Tr. 11:2–6].

On cross-examination, Grissom unequivocally testified that Wells Fargo is now in complete compliance with the Agreed Judgment. [Feb. 23, 2010 Tr. 17:21–18:5]. Yet, on further cross-examination, Grissom then had to concede that his statement was incorrect. First, he admitted that, pursuant to the Agreed Judgment, the monthly payment for principal and interest is $551.69, the monthly escrow payment is $410.24, and the sum of these two figures is $961.93. [Feb. 23, 2010 Tr. 19:12–23]. He then had to concede that Exhibit 2 (the monthly Mortgage Statement dated 11/30/2009) indicates that the combined monthly payment of principal, interest, and escrow is $984.00, not $961.93. [Feb. 23, 2010 Tr. 19:24–20:4]. Indeed, he admitted that all of the Monthly Mortgage Statements through February of 2010 indicated that the De La Fuentes had to pay $984.00 instead of $961.93. [Feb. 23, 2010 Tr. 19, 20:3–16].[20] Thus, he had to concede that Wells Fargo had been violating the Agreed Judgment by over-charging the De La Fuentes each month by $22.07 for the ten month period from May of 2009 to February of 2010.[21] [Feb. 23, 2010 Tr. 22:2–10].

Grissom attempted to explain away this violation of the Agreed Judgment by stating that as of close of business on February 22, 2010, Wells Fargo had made all the necessary corrections in its loan records to come into compliance with the Agreed Judgment. [Feb. 23, 2010 Tr. 12:16–19; 20:3–8]. And, indeed, Exhibit A (internal records of Wells Fargo) reflects that the total monthly payment is now shown to be $961.93. The problem, however, is that until Wells Fargo refunds to the De La Fuentes the $22.07 for each of the ten months that it overcharged them, Wells Fargo is indeed in violation of the Agreed Judgment, which expressly sets forth that the proper amount of the monthly payment is $961.93, not $984.00.

Grissom also attempted to navigate his way around this problem by stating that when Wells Fargo receives more funds than is required, the excess monies go into a "suspense account." [Feb. 23, 2010 Tr. 22:11–15; 24:11–25:9]. In other words, Wells Fargo does not return excess funds, but rather keeps them in an account which it controls. According to Grissom, that is what Wells Fargo did with the monthly excess of $22.07 that the De La Fuentes remitted. And, indeed, Exhibit A (internal records of Wells Fargo) shows that there is a suspense account for the De La Fuentes loan. But, there is a problem. Exhibit A shows that as of February 22, 2010, the balance of the suspense account is $109.76. Given that the De La Fuentes paid $22.07 for ten months, and that the sum of these ten payments is $220.70, there is a shortfall of $110.94 (i.e., $220.70–$109.76) for which Wells Fargo cannot account. Indeed, when asked why Exhibit A does not show the suspense account to have $220.70 instead of $109.76, Grissom had to concede that: "I do not know the answer to that question." [Feb. 23, 2010 Tr. 23:1]. Thus, Wells Fargo's own records show that the "suspense account" has fewer funds in it then it should have. Wells Fargo has not properly accounted for all of these funds. Indeed, according

**20.** Aside from the Monthly Mortgage Statement, the Business Online Account Activity as of January 21, 2010 (Exhibit 3) also incorrectly reflects that the combined payment is $984.00 instead of $961.93.

**21.** According to Grissom, the additional amount of $22.07 that the De La Fuentes paid each month was placed into a so-called "suspense account." [Feb. 23, 2010 Tr. 22:11–15; 24:11–25:9].

to Grissom, any borrower, including the De La Fuentes, have the right to have the funds sitting in a "suspense account" applied against outstanding principal. [Feb. 23, 2010 Tr. 24:5–25:9]. Thus, if the De La Fuentes requested that Wells Fargo apply the $220.70 that they overpaid against their outstanding principal, Wells Fargo would have only $109.76 to apply. In other words, Wells Fargo could not even comply with its own internal procedures.

Wells Fargo is in violation of the Agreed Judgment in another respect. The Agreed Judgment expressly sets forth that "the Plaintiffs' [i.e., the De La Fuentes'] loan shall show no outstanding fees, costs, charges or corporate advances as of April 31, 2009." [22] [Adv. Doc. No. 24]. Yet, in Exhibit A (internal records of Wells Fargo), there is a category entitled "LC DUE." When asked what this phrase means, Grissom responded: "Late charge due." The following exchange then took place between counsel for the De La Fuentes and Grissom:

> Counsel for the De La Fuentes: "So this statement says that the debtors have a late charge?"
>
> Grissom: "Correct."
>
> Counsel for the De La Fuentes: "But they are current?"
>
> Grissom: "Yes."
>
> Counsel for the De La Fuentes: "Can you explain to me how that is possible?"
>
> Grissom: "They may have made a payment late. If they make a payment after the due date, they would have a late charge."
>
> Counsel for the De La Fuentes: "So, if the debtors have evidence that they made their payments on time and paid a

late fee, that wouldn't be there, correct?"

> Grissom: "Should not be there."

[Feb. 23, 2010 Tr. 25:22–25:9].

There is no doubt that the De La Fuentes have timely made all of their payments with the exception of their payments for October and December of 2009. [Ex. No. 3]; [February 23, Tr. 42:22–43:7]. Further, Ms. De La Fuente testified that when these two late payments were made, the late fee was included with the regular monthly payment. [February 23, Tr. 42:20–43:7]. Indeed, Exhibit No. 3 (Wells Fargo's Business Online Account Activity page) indicates that the De La Fuentes were assessed two late charges in the six months prior to 01/21/2010–one on 10/16/09 and one on 12/16/09. And Exhibit No. 3 also shows that the De La Fuentes made their monthly payments shortly after these late fees were assessed, and included the additional amounts with their regular monthly payment to pay for the late fee as well. Therefore, because the De La Fuentes made all of their regular monthly payments, and also paid any late fees shortly after they were incurred, the De La Fuentes are totally current on their loan with Wells Fargo. In fact, Grissom himself unequivocally stated—not once, not twice, not three times, but four times—that the De La Fuentes were current. [February 23, Tr. 16:23–24; 16:25–17:1; 23:7–8; 25:16–17]. Moreover, Grissom unequivocally stated that there were no late charges imposed for any of the adjustments that Wells Fargo finally made on the eve of the February 23 Hearing. [February 23, Tr. 12:20–14:4]. Given all of this testimony, there is absolutely no basis for Exhibit A reflecting that the De La Fuentes owe a late charge of $78.72.[23] Ac-

---

**22.** See footnote no. 11.

**23.** It is worth noting that, even if the De La Fuentes did owe a late charge, the amount of

$78.72 would be overstated. It is important to remember that Wells Fargo, in violation of the Agreed Judgment, was sending Monthly

cordingly, because the Agreed Judgment expressly represents that the De La Fuentes loan records shall show no outstanding charges, and because the De La Fuentes have made all of their payments (including payment of the two late charges for October and December of 2009), the late charge now appearing on Exhibit A violates the Agreed Judgment. Wells Fargo's records should actually show that there are no late charges due; and until the records so reflect, Wells Fargo is in violation of the Agreed Judgment.

Having had to admit that there were errors in Wells Fargo's records in violation of the Agreed Judgment, Grissom attempted to persuade this Court that the De La Fuentes' hands are sufficiently unclean that any relief they request should therefore be denied. For example, Grissom testified to the effect that the De La Fuentes or their counsel should have contacted Wells Fargo or him prior to filing the Motion for Contempt. According to Grissom, if they had done so, then Wells Fargo would have quickly made the corrections to the loan records and there would have been no need to file the Motion for Contempt. [February 23, 2010 Tr. 15:14–19]. Second, Grissom, in conceding inconsistencies in the information set forth in the Wells Fargo's Business Online Account Activity (Ex. Nos. 2, 3, & 6), suggested that the De La Fuentes were at fault for relying on this Business Online Account Activity. Set forth below is the exchange between Grissom and counsel for the De La Fuentes about why the Business Online Account Activity sometimes shows a line item that says "Total Amount Due to Bring Loan Current" and other times does not:

Counsel for the De La Fuentes (referring to Exhibit No. 6, which is the Wells Fargo Business Online Account Activity for January and February of 2010): "Why is it that on February 19th there isn't a line item that says 'Total Amount Due to Bring Loan Current?'"

Grissom: "I can't answer that question."

Counsel for the De La Fuentes: "So sometimes it's on there and sometimes it's not?"

Grissom: "This is not an official record of Wells Fargo. This is their online process. This is a convenience for the customer. This is not considered an official record of Wells Fargo."

Counsel for the De La Fuentes: "This is what the debtor has to look at to see if they owe money, if payments have been received. They shouldn't rely on this document?"

Grissom: "Well, again, when they look at this in the middle of all the corrections that are being made to the account, it is going to be skewed by all of the changes that are being made. I mean, this shows that they were due for—next payment was due on May 1st of 2009. Clearly, that wasn't correct. But I don't know why it doesn't have the amount needed to bring the account up to date. I can't answer that question for you." [February 23, 2010 Tr. 38:1–20].

Finally, Grissom blamed the computer system for Wells Fargo's failure to comply with the Agreed Judgment. [February 23, 2010 Tr. 12:9–15, 15:2–8].

ii. *Rebuttal testimony of Ms. De La Fuente*

Ms. De La Fuente gave very credible testimony that her husband and she had

---

Mortgage Statements requiring the De La Fuentes to pay $984.00 per month rather than the correct amount of $961.93. Because the late fee is calculated as a percentage of the

amount that should be paid, Wells Fargo, whenever it calculated the late charge, used the incorrect figure of $984.00 to arrive at the amount of the late fee.

made all of their monthly payments and, when they missed the deadline on two of the payments, they not only paid the $961.93, but also simultaneously paid the late charge. [February 23, 2010 Tr. 42:14–44:14].

*iii. Testimony of Johnie Patterson, a partner at the law firm of Walker & Patterson, PC, counsel for the De La Fuentes*

Johnie Patterson (Patterson), a partner at W & P, which is the firm representing the De La Fuentes, gave testimony about the services rendered on behalf of the De La Fuentes in the prosecution of the Motion for Contempt. Patterson has approximately twenty years of experience practicing bankruptcy law and is board certified in consumer bankruptcy law. [February 23, 2010, Tr. 48:18–21]. Patterson also testified that Miriam Goott's hourly rate on this matter is $225.00. Goott is an associate attorney who has worked for W & P for seven years, and has done so as an attorney practicing bankruptcy law for approximately five to six years. [February 23, 2010 Tr. 48:22–49:1].

Much of Patterson's testimony concerned Exhibit No. 5, which is an invoice dated February 22, 2010, setting forth a description of the services rendered by both Patterson and Goott. The invoice reflects services rendered from November 18, 2009 (when Goott first consulted with Ms. De La Fuente about the inaccuracies set forth on the Monthly Mortgage Statement dated November 13, 2009) through February 22, 2010 (when Goott prepared for the February 23 Hearing). Patterson testified that the De La Fuentes were seeking an order from this Court that Wells Fargo pay the total value of the fees and costs set forth in this invoice—a total of $3,754.00, representing the sum of $3,720.00 in fees for professional services

and $34.00 in costs incurred in relation to the Motion for Contempt. He also testified that his clients want this Court to require Wells Fargo to pay the fees for services rendered by Goott and Patterson on February 23, 2010, which are not reflected in Exhibit 5. According to Patterson's testimony, Goott and he spent approximately two and a half hours each on this day in the courtroom. Goott's hourly rate is $225.00, which results in a value of $562.50 for her services rendered on February 23. Patterson's hourly rate is $325.00, which results in a value of $812.50 for his services rendered on February 23. The sum of $562.50 plus $812.50 is $1,375.00. [February 23, Tr. 46:15–50:15]. Thus, the total amount of fees and expenses which the De La Fuentes seek to recover from Wells Fargo is $3,754.00 plus $1,375.00—for a total of $5,129.00.

### III. CREDIBILITY OF WITNESSES

At the February 9 Hearing, counsel for the De La Fuentes called one witness, Ms. De La Fuente, to testify on Wells Fargo's handling of the mortgage loan. Ms. De La Fuente also provided rebuttal testimony at the February 23 Hearing. The Court finds Ms. De La Fuente to be very credible in all aspects of her testimony.

At the February 23 Hearing, counsel for the De La Fuentes also called Patterson, one of the attorneys representing the De La Fuentes. Patterson gave testimony about the services rendered by his firm on behalf of the De La Fuentes in prosecuting the Motion for Contempt. The Court finds Patterson to be very credible.

At the February 23 Hearing, counsel for Wells Fargo called one witness, Grissom, Senior Counsel for Wells Fargo, to testify on Wells Fargo's handling of the De La Fuente's mortgage loan and the corrections made to Wells Fargo's records in relation to this loan. The Court finds Grissom's credibility to be lacking in cer-

tain respects. First, he gave a Sherman-esque statement that Wells Fargo was now in compliance with the Agreed Judgment [February 23, 2010 Tr. 17:17–18:5], but then subsequently had to admit that Wells Fargo's records still contained errors in violation of the Agreed Judgment. [February 23, 2010 Tr. 22:9–23:8]. Second, he could not explain why there are late charges appearing on Wells Fargo's records. [February 23, 2010 Tr. 25:19–26:9]. Grissom's failure on these key points, combined with his nonchalance on the stand, reflects a troubling lack of perspective regarding how much is at stake for honest and diligent Chapter 13 debtors, such as the De La Fuentes, who are trying to hold on to their home, and how important it is for Wells Fargo to abide by this Court's orders when dealing with debtors. Grissom appears to be representative of the absence of any sense of urgency within Wells Fargo to maintain accurate records and comply with the law. Indeed, the following testimony from Grissom underscores this point:

> Question (from counsel for the De La Fuentes): "And is that a correct figure?"
>
> Answer (from Grissom): "Well, it is—I don't believe it is correct. However, it is correct because that's what we're presenting to the Court today."

[February 23, 2010 Tr. 27:14–17]. Apparently, it does not bother Wells Fargo, whose representative is a licensed attorney at law, to testify under oath in one breath that an escrow amount is both correct and incorrect. And, perhaps even worse, to say that this amount is correct because "that's what we're presenting to the Court today," even though he knows full well that it is incorrect.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

▮ The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(C), (L), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.,* 163 F.3d 925, 930 (5th Cir.1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts),* Adv. No. 06–3556, 2006 WL 3805670, at *19 (Bankr. S.D.Tex. Dec.22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance."). Finally, this Court has jurisdiction over this proceeding because it involves the enforcement of an order issued by this Court; namely, the Agreed Judgment. *Travelers Indem. Co. v. Bailey,* —— U.S. ——, 129 S.Ct. 2195, 2205, 174 L.Ed.2d 99 (2009); *In re Cano,* 410 B.R. 506, 546 (Bankr.S.D.Tex. 2009).

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B. Wells Fargo has been in contempt of the Agreed Judgment for several months

#### 1. The De La Fuentes have satisfied the elements of civil contempt by Wells Fargo

▮ The Fifth Circuit has held that bankruptcy courts have civil contempt powers. *Matter of Terrebonne Fuel & Lube,* 108 F.3d 609, 612–13 (5th Cir.1997). Pursuant to Fifth Circuit precedent, "[i]n a civil contempt proceeding, the party seeking an order of contempt need only establish (1) that a court order was in effect, and (sic)(2) that the order required certain

conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *F.D.I.C. v. LeGrand,* 43 F.3d 163, 170 (5th Cir.1995) (citing *U.S. v. Hayes* 722 F.2d 723, 725 (11th Cir.1984); *In re Bradley,* 588 F.3d 254, 264 (5th Cir.2009)). "To determine compliance with an order, the court simply asks whether the respondent has [performed the acts required by the order]. If he has not, the burden shifts to the respondent to rebut this conclusion, demonstrate an inability to comply, or present other relevant defenses." *LeGrand,* 43 F.3d at 170 (citing *Martin v. Trinity Indus. Inc.,* 959 F.2d 45, 47 (5th Cir.1992)); *Star Brite Dist., Inc. v. Gavin,* 746 F.Supp. 633, 643 (N.D.Miss.1990); *In re Bradley,* 588 F.3d at 264.

■ In the dispute at bar, the evidence unambiguously indicates that Wells Fargo is in contempt of this Court. The first element is satisfied because the Agreed Judgment became effective when it was entered onto the docket on July 27, 2009.

The second element is satisfied because the Agreed Judgment requires certain conduct by Wells Fargo. Specifically, the Agreed Judgment requires Wells Fargo, by August 26, 2009, to make correcting entries on the loan records of the De La Fuentes to reflect the agreements on various points concerning this particular loan all of which are set forth in the Agreed Judgment. The specific agreements set forth in the Agreed Judgment are as follows: (1) the loan of the De La Fuentes is contractually current through April of 2009; (2) the principal balance of the De La Fuentes' loan immediately prior to the application of the May 2009 monthly payment is $66,572.80; (3) the amount of the monthly payment for principal and interest, effective May of 2009, is $551.69, and

this amount will remain the same until the last scheduled payment of April 1, 2029; (4) Wells Fargo will apply all future monthly payments in accordance with the amortization schedule attached to the Agreed Judgment; (5) until the next scheduled escrow analysis is completed, the De La Fuentes shall pay, in addition to the monthly principal and interest amount of $551.69, the sum of $410.24, which represents the amount of escrow for taxes and insurance [24] (thus, the Agreed Judgment reflects that Wells Fargo has agreed that the total amount of the payment that the De La Fuentes must remit each month is the sum of $551.69 plus $410.24, or $961.93); and (6) Wells Fargo will show in its records that the De La Fuentes owe no outstanding fees, costs, charges or corporate advances as of the last day of April, 2009.

The third element is satisfied because Wells Fargo has failed to comply with the Agreed Judgment. The Court will now discuss Wells Fargo's failure to comply during three discrete time periods: (1) from July 27, 2009 (the date of the entry on the docket of the Agreed Judgment) to January 18, 2010 (the date of the entry on the docket of the Motion for Contempt); (2) from January 19, 2010 (the day following the filing of the Motion for Contempt) to the February 9 Hearing; and (3) from February 10, 2010 to the February 23 Hearing.

 *i. The first discrete time period: from July 27, 2009 (the date of the entry on the docket of the Agreed Judgment) to January 18, 2010 (the date of the entry on the docket of the Motion for Contempt)*

During this time period, the evidence is clear that Wells Fargo violated the Agreed

---

**24.** There is nothing in the record indicating that the "next scheduled escrow analysis" has been completed. Therefore, the Court concludes that the monthly escrow in effect at this time is $410.24.

Judgment in several respects. First, it failed to make the changes in its records by August 26, 2009; and then it continually failed to make these changes each day following this deadline. [February 23, 2010 Tr. 20:9–14 (Grissom admitting that the required changes had not been made until the evening of February 22, 2010)]. Second, Wells Fargo sent Monthly Mortgage Statements to the De La Fuentes expressly stating that they had to pay $984.00 rather than the correct amount of $961.93. *See e.g.,* [Ex. No. 2]. Third, Wells Fargo sent Monthly Mortgage Statements to the De La Fuentes expressly stating that the unpaid principal balance was greater than $66,572.80 even though the De La Fuentes had made each and every one of their monthly payments since May of 2009. *See, e.g.,* [Ex. No. 2, showing the balance to be $70,938.84 when it should have been $65,753.16 pursuant to the amortization schedule]. Given these violations of the Agreed Judgment, the De La Fuentes were certainly justified in filing the Motion for Contempt on January 18, 2010.

ii. *The second discrete time period: January 19, 2010 (the day following the filing of the Motion for Contempt) to the February 9 Hearing*

During this particular time period, the evidence is also clear that Wells Fargo violated the Agreed Judgment in several respects. First, Wells Fargo put information on its Business Online Account Activity expressly stating that the unpaid principal balance was greater than $66,572.80 even though the De La Fuentes made each and every one of their monthly payments. *See, e.g.,* [Ex. No. 3, showing the balance to be $71,337.82 on the website as of January 21, 2010 when it should have shown that the balance was $65,512.01].

Second, on February 8, 2010 (*i.e.,* just prior to the February 9 Hearing), by which time Wells Fargo had no doubt reviewed the Motion for Contempt and realized that it needed to make corrections, Wells Fargo put information on its Business Online Account Activity expressly stating that the unpaid principal balance was $66,572.80. Apparently, Wells Fargo, having reviewed the Motion for Contempt, inputted the $66,572.80 figure believing that it had now made the correcting entry required by the Agreed Judgment. The problem with this change is that by February 8, 2010, the De La Fuentes had made each and every one of their monthly payments such that the unpaid principal balance was less than $66,572.80 pursuant to the amortization schedule. *See, e.g.,* [Ex. Nos. 4 & 6, showing the balance to be $66,572.80 when it should be $65,390.24].

Third, Wells Fargo's Business Online Account Activity as of January 21, 2010 expressly set forth that the De La Fuentes needed to pay the sum of $8,934.72 to bring their loan current. [Ex. No. 3]. Wells Fargo's inputting this number into the online records of the De La Fuentes' loan violated the Agreed Judgment because: (1) the Agreed Judgment reflects that Wells Fargo stipulated that the loan was contractually current through April 2009; and (2) the De La Fuentes had made all of their monthly payments since May of 2009. Accordingly, there is no way that any records of the De La Fuentes' loan under the control and supervision of Wells Fargo could accurately represent that as of January 21, 2010, the De La Fuentes were in default by $8,934.72.

Fourth, Wells Fargo's Business Online Account Activity as of February 8, 2010 expressly set forth that the De La Fuentes needed to pay the sum of $9,421.52 to make their loan current. [Ex. No. 4]. Wells Fargo's inputting this number into

the online records of the De La Fuentes' loan once again violated the Agreed Judgment because: (1) the Agreed Judgment reflects that Wells Fargo stipulated that the loan was contractually current through April 2009; and (2) the De La Fuentes had made all of their monthly payments since May of 2009. Accordingly, there is no way that any records of the De La Fuentes loan under the control and supervision of Wells Fargo could accurately represent that as of February 8, 2010, the De La Fuentes were in default by $9,421.52.

Fifth, the Business Online Account Activity of January 21, 2010 represents that there are "unpaid fees/late charges" of $78.72. *See* [Ex. No. 3]. By publishing this number into the online records of the De La Fuentes' loan, Wells Fargo violated the Agreed Judgment because: (1) the Agreed Judgment reflects that Wells Fargo stipulated that the loan was contractually current through April 2009; and (2) the De La Fuentes had made all of their monthly payments since May of 2009, including any late charges. [February 23, Tr. 42:20–43:7]. Accordingly, there is no way that any records of the De La Fuentes loan under the control and supervision of Wells Fargo could accurately represent that as of January 21, 2010, the De La Fuentes owed late charges of $78.72.

Sixth, the Business Online Account Activity of February 8, 2010 represents that there are "unpaid fees/late charges" of $78.72. *See* [Ex. No. 4]. Wells Fargo's inputting this number into the online records of the De La Fuentes' loan once again violated the Agreed Judgment because: (1) the Agreed Judgment reflects that Wells Fargo stipulated that the loan was contractually current through April 2009; and (2) the De La Fuentes had made all of their monthly payments since May of 2009, including any late charges. Accordingly, there is no way that any records of the De

La Fuentes loan under the control and supervision of Wells Fargo could accurately represent that as of February 8, 2010, the De La Fuentes owed late charges of $78.72.

### iii. The third discrete time period: February 10, 2010 to the February 23 Hearing

During this particular time period, the evidence is also clear that Wells Fargo continued to be in violation of the Agreed Judgment in several respects. First, the Business Online Account Activity of February 10 incorrectly shows that there are late charges of $78.72. [Ex. No. 6]. Second, this same day's activity reflects that the outstanding principal balance is $66,572.80 when it should be $65,390.24 pursuant to the amortization table. *See* [Exhibit No. 6]. Third, the Business Online Account Activity incorrectly reflects that the De La Fuentes need to pay $9,698.02 to bring their loan current. [Exhibit No. 6]. Fourth, Wells Fargo still had taken in $220.70 by requiring the De La Fuentes to pay $984.00 each month for ten months, rather than the correct monthly payment of $961.93 delineated in the Agreed Judgment. These overpayments leave Wells Fargo with $220.70 more than it should have under the Agreed Judgment, and Wells Fargo's retention of these funds in the "suspense account" constitutes a violation of the Agreed Judgment.

With respect to the Business Online Account Activity of February 12, 13, 14, 15, 18, 21, & 22, the same four violations described in the paragraph immediately above are also present. For some inexplicable reason, the Business Online Account Activity of February 16 & 19 shows that the De La Fuentes are not in default—*i.e.,* that they did not have to pay $9,698.02 to bring their loan current. That is the good news. The bad news is that the Business

Online Account Activity for these two days still inaccurately represents that the unpaid balance is $66,572.80 and that there are unpaid late charges of $78.72. Moreover, Wells Fargo still had $220.70 more than it should have under the Agreed Judgment, and it had not returned these funds to the De La Fuentes.

Finally, the Business Online Account Activity of February 23, 2010 accurately represents that there is no default and that the outstanding principal balance is now $65,390.24, which is in fact the correct number pursuant to the amortization schedule attached to the Agreed Judgment. Once again, that is the good news. However, the bad news is that the Business Online Account Activity of February 23, 2010 continues to falsely represent that the De La Fuentes owe late charges of $78.72. Thus, even as of the date of the second part of the hearing on the Motion for Contempt—*i.e.*, even as of the February 23 Hearing—Wells Fargo was still in violation of the Agreed Judgment.

 *2. Wells Fargo has failed to demonstrate an inability to comply with the Agreed Judgment, or any other relevant defenses*

■ With the De La Fuentes having satisfied the elements of civil contempt, the burden shifts to Wells Fargo to demonstrate an inability to comply with the Agreed Judgment, or establish any other relevant defense. *See LeGrand,* 43 F.3d at 170 (citing *Martin v. Trinity Indus. Inc.,* 959 F.2d 45, 47 (5th Cir.1992)); *Star Brite Dist., Inc. v. Gavin,* 746 F.Supp. 633, 643 (N.D.Miss.1990); *In re Bradley,* 588 F.3d at 264. Wells Fargo has failed to do so. Indeed, Grissom conceded that Wells Fargo's records had been inaccurate and required modification to bring them into compliance with the Agreed Judgment. [Feb. 23, 2010 Tr. 10:13–11:1]. Grissom

also admitted that the records were not brought into full compliance until the evening of February 22, 2010. [Feb. 23, 2010 Tr. 12:1–19]. Then, at the February 23 Hearing, he first testified that Wells Fargo had come into complete compliance, but then had to concede that this was not true. [February 23, 2010 Tr. 26:6–9, 33:19].

Additionally, Wells Fargo failed to demonstrate an inability to comply with the Agreed Judgment, or any other relevant defenses. In an apparent attempt to excuse away Wells Fargo's failure to abide by the terms of the very judgment to which it expressly agreed, Wells Fargo offered four explanations: (1) Wells Fargo's accounting software would not allow it to make all the necessary changes to the De La Fuentes' account [*See, e.g.,* February 23, 2010 Tr. 55:14–18]; (2) the De La Fuentes did not bring Wells Fargo's non-compliance with the Agreed Judgment to Wells Fargo's attention before filing the Motion for Contempt [*See, e.g.,* February 23, 2010 Tr. 55:14–18]; (3) the information set forth on the Online Business Account Activity does not constitute an "official record" of Wells Fargo and therefore the De La Fuentes assume the risk of relying on these records; and (4) Wells Fargo did not willfully fail to make the correcting entries [*See, e.g.,* February 23, 2010 Tr. 54:3–6].

■ With respect to the first contention, the Court is highly skeptical that, if properly motivated, Wells Fargo could not make the necessary changes to the De La Fuentes' account in the same business day, or, at the most, two business days. First, the record indicates that Wells Fargo is capable of flurries of activity correcting entries on the day before a hearing—here, on the day before the February 23 Hearing.[*See, e.g.,* February 23, 2010 Tr. 12:17–19]. Second, Grissom's testimony that "[i]t is my understanding that there are system limitations" [February 23, 2010 Tr.

15:2–3] is hearsay to which this Court gives very little weight; at the February 23 Hearing, he was not qualified as an expert in computer information systems or electronic record keeping. Finally, Wells Fargo does not contend, and realistically cannot contend, that the quirks of its accounting software rendered it incapable of complying with the requirements of the Agreed Judgment, which gave Wells Fargo thirty days to bring its records into compliance. Indeed, by signing the Agreed Judgment, Wells Fargo was representing that it could correct its records within thirty days. Not only did Wells Fargo fail to bring its records into compliance within this liberal thirty-day period, Wells Fargo has failed to comply with the Agreed Judgment for almost six months. Indeed, Wells Fargo is still not in complete compliance.

■ With respect to the second contention, that the De La Fuentes did not contact Wells Fargo regarding Wells Fargo's noncompliance with the Agreed Judgment, the Court disagrees. In fact, the De La Fuentes contacted Wells Fargo about these issues when they were required to call in to make their monthly payment to Wells Fargo; Ms. De La Fuente's testimony was very clear on this point. [February 9, 2010 Tr. 12:4–16]. Granted, Ms. De La Fuente did not expressly say to the Wells Fargo representative that "Wells Fargo is in violation of the Agreed Judgment." Nevertheless, she did convey to the representative that the figures showing up on the Business Online Account Activity were incorrect.

Grissom attempted to counter this point by testifying that if the De La Fuentes or their counsel had only communicated with **him** about Wells Fargo's failure to correct its records, such corrections would have been made without further ado. [February 23, 2010 Tr. 15:14–19]. The Court has

difficulty giving much credence to this point because when Grissom did become aware of the problem—which he testified was on the date that the Motion for Contempt was filed, i.e., on January 18, 2010 [February 23, 2010 Tr. 11:7–11]—Wells Fargo still did not correct the defects in its records as required by the Agreed Judgment. Indeed, even though the Motion for Contempt was filed on January 18, 2010, and even though Wells Fargo had until February 9, 2010 (*i.e.,* the date of the first hearing on the Motion for Contempt) to correct the problems in its records of the De La Fuentes' loan, Wells Fargo still failed to make all of the required corrections. Thus, Grissom's testimony on this point is not credible.

Finally, even though neither the De La Fuentes nor their counsel notified Grissom, it does not constitute a defense to civil contempt of the Agreed Judgment. Indeed, both counsel for Wells Fargo and Grissom admitted that the De La Fuentes had no responsibility to help Wells Fargo comply with the Agreed Judgment [February 23, 2010 Tr. 39:23–40:9; 54:19–55:1], so this argument is misplaced. Moreover, one wonders why Wells Fargo would need any notice that it needed to correct its records given that: (1) the Agreed Judgment resulted from the De La Fuentes filing the Adversary Proceeding against Wells Fargo for improper and inaccurate entries in the loan records; (2) Wells Fargo and the De La Fuentes, through their respective attorneys, announced a settlement orally on the record on April 21, 2009, and one of the terms of this settlement included the correction of records by Wells Fargo; (3) Wells Fargo felt compelled to file a Motion for Entry of Final Judgment on June 10, 2009 when the parties were unable to agree on the amount of the monthly escrow that had to be paid, and Wells Fargo submitted a proposed

judgment which required it to make correcting entries; (4) on July 20, 2009, this Court denied the Motion for Entry of Final Judgment and set trial for July 28, 2009; and (5) on July 27, 2009, the parties entered into and filed the Agreed Judgment which expressly required Wells Fargo to make correcting entries. If Wells Fargo did not have sufficient notice through all of these circumstances and events to realize that it really did need to correct the inaccuracies in the loan files of the De La Fuentes, then this Court is skeptical that a letter or a phone call from the De La Fuentes or their counsel to Grissom would have led Wells Fargo to make the corrections. But, in any event, the De La Fuentes had no legal duty to give notice to Wells Fargo that it was violating the terms of the very Agreed Judgment into which Wells Fargo had entered. The need to make correcting entries should have been a huge blip on Wells Fargo's radar screen upon the entry of the Agreed Judgment, if not much earlier than that. Wells Fargo should not have to be told to comply with the terms of an Agreed Judgment.

■ With respect to the argument that the Business Online Account Activity is not an "official record" of Wells Fargo, the clear implication is that Wells Fargo has no duty to ensure the accuracy of the information contained thereon and that debtors such as the De La Fuentes assume the risk of relying on this information. This is a Catch–22 argument. In the computer age in which we live, consumers are expected to obtain information from their financial institutions by going online and reviewing this information—which is published online by these very institutions, including Wells Fargo. If consumers such as the De La Fuentes cannot rely on the information set forth online, and if institutions such as Wells Fargo are not responsible for publishing accurate information online, then faith in the integrity of the very system by which we live will be severely undermined. In essence, Wells Fargo's argument is that the phrase "loan records" in the Agreed Judgment—which, it must be remembered, Wells Fargo is required to correct—does not encompass the information about the De La Fuentes' loan that Wells Fargo publishes online. The Court cannot accept this disingenuous argument.

■ Finally, it is of no moment that Grissom testified that Wells Fargo's failure to comply with the Agreed Judgment has not been willful. [Feb. 23, 2010 Tr. 11:2–6]. In assessing whether Wells Fargo is in civil contempt of the Agreed Judgment, it is irrelevant whether Wells Fargo's failure to comply is willful. *In re Bradley*, 588 F.3d at 264.

■ Nor does Wells Fargo's argument that it simply made an honest error pass muster. In Grissom's own words: "Mistakes happen, we're all human. And when mistakes occur—even though we are a big bank, we are run by humans. And when mistakes occur—and there will be mistakes. Our error ratio is very low for the number of loans that we service." [February 23, 2010 Tr. 40:11–14]. The Court certainly agrees that "mistakes happen." However, when mistakes happen not once, not twice, but repeatedly, and when actions are not taken to correct these mistakes within a reasonable period of time, the failure to right the wrong—particularly when the basis for the problem is a months-long violation of an agreed judgment—the excuse of "mistakes happen" has no credence. Here, Wells Fargo's failure to take corrective action to comply with the Agreed Judgment does not come within hailing distance of the realm where "mistakes happen" is a legitimate excuse. Rather, such failure, if not willful refusal

to comply with the Agreed Judgment, is at least reckless disregard of the Agreed Judgment.

 Moreover, Grissom's gratuitous statement that "[o]ur error rate is very low for the number of loans that we service" [Feb. 23, 2010 Tr. 40:13–14] is disingenuous for two reasons. First, even if the statement is true—and this Court expressly makes no such finding, as Grissom gave no specific testimony about the number of loans serviced by Wells Fargo and the number of errors made by Wells Fargo relating to those loans—Wells Fargo's numerous and continuous errors **in this case** have caused the De La Fuentes to constantly fear that Wells Fargo is attempting to foreclose on their homestead. The consternation in Ms. De La Fuente's voice when she gave the following testimony was palpable: "I can't even count how much time. Every time I look at my account, the stress, the pain, the anxiety. It's frustrating and upsetting. 'Cause I figured, I mean, we did what we were supposed to do. We caught up, we paid, and we've stayed caught up." [February 9, 2010 Tr. 11:19–23].

Second, recent case law contradicts the suggestion by Grissom that Wells Fargo rarely commits errors. *See, e.g., Nibbelink v. Wells Fargo Bank,* 403 B.R. 113, 116 (Bankr.M.D.Fla.2009) (Wells Fargo sanctioned for overcharging Chapter 13 debtors, threatening to foreclose on the debtors' home, and keeping incorrect records of the debtors' loan); *Wells Fargo Bank v. Jones,* 391 B.R. 577, 582 (E.D.La.2008) (Wells Fargo sanctioned for collecting sums far in excess of the amounts reasonably necessary to satisfy the loan; collecting both pre and post-petition charges from property of the estate without authorization; delaying the return of the debtor's property for over one year; failing to provide a reasonable accounting of

the loan history; and improperly applying payments resulting in significant additional and unwarranted interest charges); *Myles v. Wells Fargo,* 395 B.R. 599, 601 (Bankr. M.D.La.2008) (Wells Fargo admonished for failing to comply with the terms of the plan and violating the automatic stay by treating the debtors' mortgage debt as if they were in default rather than current as of the petition date; misapplying the debtors' monthly mortgage payments; depositing debtors' direct monthly payments on the current mortgage debt into a suspense account and not applying them to the post-petition mortgage debt; and failing to disclose any of these actions to the debtors).

In sum, this Court concludes that Wells Fargo is in contempt of the Agreed Judgment and has failed to establish that it is incapable of complying with its terms or that it has some other applicable defense.

### 3. Action that this Court will take to coerce Wells Fargo to comply with the Agreed Judgment

Appropriate action for this Court to take in the wake of a finding of civil contempt includes: (1) a daily fine that is levied and paid to the Clerk of Court until the contemnor comes into compliance; (2) a compensatory fine to be paid to the movants; and (3) reasonable attorneys' fees and costs incurred by the movants. *In re Bradley,* 588 F.3d at 263–264. The Court addresses each of these in turn with respect to the suit at bar.

#### i. Daily fine

 In paragraph 19 of the Motion for Contempt, the De La Fuentes request that Wells Fargo pay a per diem sanction of $2,500.00 until Wells Fargo complies with the Agreed Judgment. The Court has so far declined to impose this amount of per diem sanction. However, at the close of the February 9 Hearing, the Court orally

ordered that Wells Fargo would henceforth be liable on a per diem basis for the amount of $1,182.56 for each day that passed until it corrected the inaccurate principal balance figure so that the proper amount of $65,390.24 would replace the improper amount of $66,572.80. On February 10, 12, 13, 14, 15, 16, 18, 19, 21, and 22, the Wells Fargo Business Online Account Activity continued to inaccurately represent that the principal balance was $66,572.80. [Ex. No. 6]. It was only by the beginning of the February 23 Hearing that the Business Online Account Activity finally reflected the correct outstanding principal balance pursuant to the amortization schedule attached to the Agreed Judgment. [Exhibit No. 6]. Thus, when the February 23 Hearing began, Wells Fargo had become liable to this Court for the amount of $11,825.60 (*i.e.*, $1,182.56 × 10 days).

Meanwhile, because Wells Fargo continues to violate the Agreed Judgment by inaccurately representing in its records that the De La Fuentes have late charges of $78.72, this Court concludes that it is appropriate to increase the amount of the coercive per diem fine. Thus, beginning three business days after this Memorandum Opinion is entered on the docket, this Court will impose a per diem coercive fine on Wells Fargo of $1,261.28 (*i.e.*, $1,182.56 + $78.72), and this amount will accrue each day until Wells Fargo comes into compliance with the Agreed Judgment. Moreover, Wells Fargo must deliver to the Clerk of Court a check for the amount of

$11,825.60. Wells Fargo will have three business days to take this action. Stated differently, Wells Fargo will be liable for $1,261.28 per day, effective May 21, 2010 (i.e., three business days from the entry on the docket of this Memorandum Opinion), until: (1) Wells Fargo comes into complete compliance with the Agreed Judgment, including removing any reference that the De La Fuentes presently owe late charges of $78.72; and (2) Wells Fargo delivers to the Clerk of Court a check for the amount of $11,825.60.

Finally, this Court will hold a hearing on May 28, 2010 to determine if Wells Fargo is in complete compliance as set forth above.[25] At this hearing, Wells Fargo has the burden to prove that it is in compliance with the Agreed Judgment in every respect. In order to emphasize to Wells Fargo the importance of proving that it is in complete compliance with the Agreed Judgment, the Court wants Wells Fargo to know that if the Court finds at the end of this hearing that Wells Fargo is still in violation of the Agreed Judgment or has failed to deliver the check for $11,825.60 to the Clerk of Court, the Court will also require Wells Fargo to pay the amount of $2,600.80 to the Clerk of Court. This amount is 4% of the principal balance that the De La Fuentes will owe Wells Fargo as of the date of that hearing pursuant to the amortization schedule attached to the Agreed Judgment. The figure of 4% is the same percentage that Wells Fargo has used to calculate late charges when the De

---

**25.** On April 5, 2010, the De La Fuentes submitted a Status Report [Adv. Doc. No. 38] to which were attached documents that were not introduced into the record at either the February 9 or the February 23 Hearing because they were generated well after February 23. These documents purport to be from the Wells Fargo's Business Online Account Activity screen as of April 5, 2010. The online documents reflect that the outstanding princi-

pal balance is incorrect and that there are still late charges of $78.72, which is also inaccurate. At the hearing to be held on May 28, 2010, the De La Fuentes will be given an opportunity to rebut any evidence that Wells Fargo introduces to show compliance with the Agreed Judgment. And, so that there is no misunderstanding, the burden will be on Wells Fargo to prove that it is in complete compliance with the Agreed Judgment.

La Fuentes have made untimely loan payments.

### ii. Compensatory fine

Ms. De La Fuente testified that her husband and she have not suffered any damages as a result of Wells Fargo's violation of the Agreed Judgment. [February 23, 2010 Tr. 16:15–17:10]. Accordingly, this Court declines to grant any such relief as it would relate to severe emotional distress, lost wages, or lost profits. However, the De La Fuentes have suffered damages insofar as they have overpaid Wells Fargo by $220.70 (*i.e.,* $22.07 × 10 months), and Wells Fargo has never returned these funds. Accordingly, Wells Fargo must, by no later than May 21, 2010 return the sum of $220.70. At the hearing to be held on May 28, 2010, the Court will expressly inquire whether these funds have been returned to the De La Fuentes.

### iii. Reasonable attorneys' fees and costs incurred by the De La Fuentes

### a. Power of this Court to award attorneys' fees to the De La Fuentes as damages resulting from Wells Fargo's contemptuous behavior

Under Fifth Circuit precedent, " '[c]ivil contempt can serve two purposes,' either coercing compliance with an order or 'compensat[ing] a party who has suffered unnecessary injuries or costs because of contemptuous conduct.' " *In re Bradley,* 588 F.3d at 263–64. Attorneys' fees incurred in rectifying another party's contemptuous conduct are a type of injury or cost that can be compensated in a suit for civil contempt. *See, e.g., Travelhost, Inc. v. Blandford,* 68 F.3d 958 (5th Cir. 1995).

### b. Standard for evaluating reasonableness in attorneys' fees requests

In determining what is reasonable for an attorneys' fees award, bankruptcy courts must follow a three step process outlined in *First Colonial:* (1) ascertain the nature and extent of the services supplied by the attorney with reference to the time records submitted; (2) assess the value of the services; and (3) briefly explain the findings and reasons upon which the award is based, including a discussion of how each of the twelve factors from *Johnson* affected the court's decision. *In re First Colonial Corp. of Am.,* 544 F.2d 1291, 1299–1300 (5th Cir.1977); *See Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974).

### c. Step one of the *First Colonial* analysis

With respect to the first of the three steps of the *First Colonial* analysis, this Court has ascertained the nature and extent of Walker & Patterson, PC's (W & P) services through a review of W & P's time records, which were introduced into evidence as Exhibit 5,[26] and the testimony given by Patterson at the February 23 Hearing.

W & P's time records and Patterson's testimony indicate that two W & P attorneys—Patterson and Goott—billed the De La Fuentes for professional services related to this matter. According to Exhibit 5, W & P charged the De La Fuentes a total of $3,754.00, representing the total of $3,720.00 in fees (for 15.20 hours of professional services by the two W & P attorneys), and $34.00 in copying charges incurred in relation to the Motion for Contempt. Patterson's testimony indicated that, in addition to the amounts listed

---

**26.** Exhibit 5 was admitted without objection under the condition that any of the hearsay statements in this exhibit are not to be part of the record or used for argument.

on Exhibit 5, the De La Fuentes also seek the fees incurred for services rendered by Goott and Patterson at the February 23 Hearing.

On February 23, 2010, W & P began providing services at 8:30 a.m., according to Patterson's testimony, and finished providing services at 11:08 a.m. [February 23, 2010 Tr., 50:10–12]. This represents a period of approximately two hours and thirty minutes. Expressed purely in units of hours, two hours and thirty minutes converts to 2.5 hours. W & P had two attorneys present for the February 23 Hearing—Patterson, whose professional services, according to Exhibit 5 and his own testimony, are billed at $325.00 per hour; and Goott, whose professional services are billed at $225.00 per hour—representing a combined hourly rate for professional services of $550.00 per hour (*i.e.*, $325.00 per hour + $225.00 per hour = $550.00 per hour). As a result, the De La Fuentes request attorneys' fees and costs in the amount of $1,375.00 for the professional services rendered on February 23 by W & P (*i.e.*, 2.5 hours × $550.00 per hour = $1,375.00). Thus, the total amount of attorneys' fees and costs requested by the De La Fuentes is $5,129.00—*i.e.*, the sum of the amount represented in Exhibit 5 ($3,754.00) and the amount incurred on February 23, 2010 ($1,375.00).

Exhibit 5 breaks the professional services provided by W & P to the De La Fuentes into discrete services, and sets forth the time spent on each service, the attorney providing the service, the hourly rate for the service provided, and the total amount charged for each discrete service. As a result of this specificity, the Court is able to determine the amount of time allocated to each service and the value of the services rendered. In other words, the time records submitted by W & P allow

this Court to determine the nature and extent of the services supplied by each attorney at W & P. Patterson testified that all entries in Exhibit 5 are related to the Motion for Contempt, and, pursuant to W & P policy, were reviewed to eliminate duplicate billing. Of the 15.20 hours billed as represented in Exhibit 5, much of this time was spent drafting the Motion for Contempt or preparing for the February 9 Hearing; there was also time spent consulting with the De La Fuentes and communicating with counsel for Wells Fargo. Goott rendered the vast majority of the services for which fees are requested.

Although the fees sought by the De La Fuentes for services provided on February 23 are not itemized in a time sheet, this Court concludes that the circumstances surrounding the rendering of the services for which the fees are sought (specifically that these services were provided at a hearing before the Court) make reference to a time sheet unnecessary, as the Court has no difficulty determining the nature and extent of the services rendered by W & P's attorneys. The fees incurred on February 23 are unquestionably the result of the services provided that related to the February 23 Hearing. And, under these circumstances, the Court believes it reasonable to find that the services provided while Patterson and Goott were in the Courtroom on February 23 for which fees are sought should be characterized as necessary services that have produced a successful result for the De La Fuentes.

### d. Step two of the *First Colonial* analysis

With respect to the second of the three steps of the *First Colonial* analysis, the Court concludes that the professional services rendered by W & P were highly valuable to both the De La Fuentes and the integrity of the bankruptcy system. Wells Fargo has, before and after the en-

try of the Agreed Judgment on the docket, kept incorrect records on the De La Fuentes' home loan. The record before this Court demonstrates that no amount of protest from the De La Fuentes themselves was adequate to cause Wells Fargo to respond and fix the problem. Moreover, Wells Fargo, when dealing directly with the De La Fuentes, overcharged them on their monthly payments for their homestead loan. Again, the record indicates that no amount of protest from the De La Fuentes alone was adequate to persuade Wells Fargo to rectify the errors and comply with the Agreed Judgment.

In light of this pattern in Wells Fargo's behavior, it is reasonable to assume that Wells Fargo would have gone on treating the De La Fuentes in this manner had they not enlisted the assistance of counsel to assert their rights. In fact, the significant value of W & P's services is at least partially demonstrated by the fact that it was not until after W & P filed the Motion for Contempt on behalf of the De La Fuentes that Wells Fargo even began to respond, albeit slowly and incompletely, to the De La Fuentes' complaints. Moreover, as this Court has spelled out in this opinion, W & P obtained a vindication of the De La Fuentes' rights through the prosecution of the Motion for Contempt. This Court now has notice of Wells Fargo's failures and misdeeds with respect to the De La Fuentes, and will take steps to ensure Wells Fargo's compliance with the Agreed Judgment. Moreover, W & P's services have proven valuable to the integrity of the bankruptcy system. As discussed above, the integrity of the bankruptcy system relies on the good faith of both debtors **and** creditors. However, no court can monitor all of the parties outside the courtroom to ensure good-faith compliance with its orders, and therefore must rely on the parties themselves to bring non-compliance to that court's attention.

Here, W & P, in filing the Motion for Contempt, served just that role. By filing the Motion for Contempt, W & P brought Wells Fargo's violation of the Agreed Judgment to the attention of this Court so that it can coerce Wells Fargo into compliance and protect the integrity of the bankruptcy system. In sum, W & P's services in filing the Motion for Contempt and advocating for the De La Fuentes in this dispute resulted in great value to both the De La Fuentes in particular and the bankruptcy system in general.

In addition to obtaining valuable results for the De La Fuentes, W & P tailored its services to limit unnecessary work. A review of Exhibit 5 indicates that W & P only billed the De La Fuentes for services provided which were necessary to the representation (*i.e.*, services which would be of value to the De La Fuentes), with one minor exception. At the February 9 Hearing, both Patterson and Goott were present in the courtroom to represent the De La Fuentes, and Exhibit 5 reflects that the De La Fuentes were billed for the time of both attorneys. However, at that February 9 hearing, Patterson did not introduce evidence into the record, adduce testimony, or appear to provide other services specifically pertinent to the representation of the De La Fuentes. In addition, Patterson conceded at the February 23 Hearing that Goott had primarily handled the matter of the Motion for Contempt, so his presence cannot be justified on the basis of a greater familiarity of the case. Finally, Goott, though not possessing the same wealth of experience that Patterson does, has worked at W & P for approximately six years and has capably represented the De La Fuentes at both the February 9 Hearing and February 23 Hearing. Thus, Patterson's presence was not necessary on the basis of his greater experience in representing debtors in bankruptcy court. As

a result, this Court concludes that Patterson's presence at the February 9 Hearing did not provide any substantial value to the De La Fuentes.[27] Therefore, this Court will remove the $585.00 billed to the De La Fuentes for the 1.8 hours Patterson spent at the February 9 Hearing from its consideration of the amount of approved fees. In other words, this Court will assess the De La Fuentes' attorneys' fee request as being for $4,544.00 (*i.e.*, $5,129.00–$585.00 = $4,544.00) rather than $5,129.00.

### e. Step three of the *First Colonial* analysis

Finally, as required by the third step of the *First Colonial* three-step analysis, this Court sets forth its conclusions using the twelve factors set forth in *Johnson.*

#### (1). Time and labor required

As already noted, according to Exhibit 5, W & P's attorneys spent 15.2 hours drafting the Motion for Contempt, preparing for hearings, representing the De La Fuentes at the February 9 Hearing, and consulting with their clients and opposing counsel. W & P's attorneys also spent a combined 5.2 hours providing services in relation to the February 23 Hearing. The Court concludes that Exhibit 5 is sufficiently detailed (and the services provided on February 23 self-evident enough) to allow this Court to conclude that, with the exception of Patterson's presence at the February 9 Hearing, the services rendered by the W & P personnel were necessary and resulted in a tangible, identifiable, and material benefit for the De La Fuentes. In sum, this Court concludes that this factor weighs in favor of concluding that all of the compensation for which the De La Fuentes seek reimbursement—with

one exception—is reasonable. The Court has already concluded that it should reduce the requested reimbursement by $585.00. With that said, after the $585.00 is removed from the De La Fuentes' attorneys' fees request, the time and labor expended on prosecuting the Motion for Contempt is in line with the time and labor required to prosecute the Motion for Contempt competently. Accordingly, this factor favors a finding that the De La Fuentes' fee request is reasonable.

#### (2). Novelty and difficulty of the questions

No evidence was introduced, nor testimony adduced, as to the novelty and difficulty of the legal questions involved in prosecuting the Motion for Contempt. In this Court's view, the questions presented by the Motion for Contempt were neither novel nor difficult. The test for civil contempt has been handed down by clear Fifth Circuit precedent. It requires that the De La Fuentes show only that (1) there was an order from this Court; (2) Wells Fargo is required to perform certain actions under this order; and (3) Wells Fargo has failed to perform all of these actions. Proof of each of these elements was easily obtained as they consisted of the Agreed Judgment and printed documents from Wells Fargo's own Business Online Account Activity portal and Monthly Mortgage Statements.

It is this Court's view that, although this factor may facially weigh against the reasonableness of the De La Fuentes' attorneys' fees request, a review of W & P's time records indicates that W & P's attorneys did not spend excessive time on this matter, even considering the relative-

---

27. However, this Court concludes that Patterson did provide value to the De La Fuentes by being present at the February 23 Hearing due to his role as the sole witness called to testify on the De La Fuentes' request for attorneys' fees and costs incurred in prosecuting the Motion for Contempt.

ly mundane nature of the questions presented. W & P's attorneys spent, excluding time spent at both the February 9 and February 23 Hearings, only 11.6 hours drafting and prosecuting the Motion for Contempt. This Court discerns no unnecessary entries on Exhibit 5, particularly in light of the fact that Goott, the junior attorney working on the matter (with a lower hourly billing rate than Patterson), did the lion's share of the work. Even the most basic, straightforward matters still require some time and attention to be performed competently—basic drafting and editing of pleadings and motions, consultation with clients, settlement negotiations with opposing counsel, time in hearings—and these are the only items reflected in Exhibit 5 as services provided by W & P. It would be nonsensical to say that the De La Fuentes should not be compensated for the attorneys' fees they incurred in vindicating their rights against a bad-faith creditor simply because they had such a strong and straightforward case. As such, this Court treats this factor as neither favoring nor disfavoring a finding that the De La Fuentes' fee request is reasonable.

### (3). Skill required to perform the legal services properly

The legal services provided by W & P required general trial skills. Both W & P attorneys who provided services to the De La Fuentes have experience in bankruptcy and representing clients at hearings, and displayed their competence in this case. As with the factor above, regarding the novelty and difficulty of the questions presented, this dispute did not require a particularly high level of skill to perform the legal services properly. However, as also noted above, W & P's attorneys performed their services for this dispute with relative economy. Therefore, this Court treats this factor as favoring a finding that the De La Fuentes' fee request is reasonable.

### (4). Preclusion of other employment due to acceptance of this case

Exhibit 5, along with Patterson's testimony, indicates that the acceptance of this dispute required W & P attorneys to devote time to this matter from November 18, 2009 to February 23, 2010. There is nothing in the record indicating that W & P had to refuse employment in other matters by accepting the representation of the De La Fuentes. Accordingly, this factor neither favors nor disfavors a conclusion that the De La Fuentes' fee request is reasonable.

### (5). Customary fee

At the February 23 Hearing, Patterson testified that his own billing rate of $325.00 per hour is based on his 20 years of experience practicing bankruptcy law and his certification in consumer bankruptcy law. [February 23, 2010 Tr. 48:15–21]. Patterson also testified that Goott's billing rate of $225 per hour reflects the market rate for the services she provides. [February 23, 2010 Tr. 48:22–49:7]. Given the experience of these individuals, this Court concludes that W & P's hourly rates are actually lower than those charged by similarly experienced and talented attorneys in the Southern District of Texas. Accordingly, this Court concludes that this factor weighs in favor of a conclusion that the De La Fuentes' attorneys' fee request is reasonable.

### (6). Whether the fee is fixed or contingent

Exhibit 5 and Patterson's testimony reflect that the De La Fuentes' attorneys' fee agreement with W & P was not contingent, and nothing in the record indicates that the attorneys' fee agreement was a fixed fee. Exhibit 5, along with Patterson's testimony, reflects a straightforward hourly billing system. Because, as stated above, both the hourly rate and the num-

ber of hours billed for this matter are reasonable, this Court concludes that the hourly billing system used is at least as beneficial to the De La Fuentes, if not more so, than if the fee arrangement was a fixed fee or a contingent fee. Indeed, given that prosecuting a motion for contempt in a consumer bankruptcy context rarely results in an award of damages to the debtors, a contingent fee arrangement is wholly impractical. Accordingly, this factor favors a conclusion that the De La Fuentes' attorneys' fee request is reasonable.

### (7). Time limitations imposed by the client or other circumstances

By the time that the De La Fuentes contacted W & P regarding Wells Fargo's failure to comply with the Agreed Judgment, the De La Fuentes were extremely frustrated and scared. They were justified in having such feelings given that Wells Fargo had led them on a severe runaround by failing to comply with the terms of the Agreed Judgment. In short, there were special circumstances in this matter; rarely, does a party to an Agreed Judgment violate the terms to which it has agreed to such a large extent and for such a long period of time. W & P's actions on behalf of the De La Fuentes were taken to deal with these special circumstances. Thus, this Court concludes that this factor strongly favors the De La Fuentes' attorneys' fee request as reasonable.

### (8). Amount involved and the results obtained

There is no question, and the Court so concludes, that with the entry of this Memorandum Opinion and its related order on the docket, W & P obtained a tangible, identifiable, and material benefit for the De La Fuentes. In his closing, counsel for Wells Fargo, John Ely (Ely), argued that the fee request is not reasonable because it is in excess of the "initial amount to be written down in this account" [February 23, 2010, Tr. 56:21–24]—i.e., that because the incorrect principal balance that Wells Fargo failed to correct was overstated by approximately $5,000.00, it is unreasonable to award attorneys' fees of $5,144.00, and that the fees awarded should be a percentage of the error.

The weakness in this argument is that the overstated principal balance has been just one of the errors made by Wells Fargo. Ely overlooks the fact that Wells Fargo has incorrectly been requiring the De La Fuentes to pay $984.00 per month, rather than $961.93; that it has been incorrectly asserting that the De La Fuentes are in default by $8,934.72, and then $9,421.52, and then $9,698.02; that it has also failed to account for the $220.70 that should be in the "suspense account"; and that it continues to incorrectly state that the De La Fuentes owe late charges of $72.78. Given all of these problems, the Court concludes that attorneys' fees of $4,544.00 is an eminently reasonable amount to require Wells Fargo to make these corrections.

Moreover, Ely's argument highlights Wells Fargo's misunderstanding of, and nonchalance towards, its mistreatment of the De La Fuentes. The stakes in this dispute are not simply limited to the difference between the correct principal balance according to the Agreed Judgment and the incorrect principal balance as set forth in Wells Fargo's records, but also the ability of the De La Fuentes to conduct their affairs without the harassment of a bad-faith creditor, without constant battles over the correct amount of their monthly payment, and without worries of further threats that Wells Fargo will improperly foreclose on their homestead. Coercing Wells Fargo to comply with the Agreed Judgment will potentially forestall a great deal of financial harm to the De La

Fuentes that could have occurred as a consequence of further violations of the Agreed Judgment. Indeed, the worst case scenario could see the De La Fuentes lose their home because Wells Fargo—using incorrect numbers in violation of the Agreed Judgment—proceeds to give notice of default, post the homestead for foreclosure, and hold a foreclosure sale.

Under these circumstances, W & P has efficiently achieved the De La Fuentes' objective of obtaining both accuracy and peace of mind, and the amount requested (excluding the $585.00 billed for Patterson's presence at the February 9 Hearing) of $4,544.00 is by no means out of line given the good results that were obtained and the potential harm that could have befallen the De La Fuentes without W & P's services. Accordingly, this factor strongly favors a conclusion that the De La Fuentes' attorneys' fee request is reasonable.

### (9). Experience, reputation, and ability of the attorney

Patterson has approximately twenty years experience practicing bankruptcy law, is board certified in consumer bankruptcy law, and has successfully tried numerous adversary proceedings in this Court. Goott has approximately five to six years of experience in bankruptcy law and although she has less experience than Patterson in trying suits in this Court, she has successfully prosecuted motions and suits in this Court and is an effective advocate for her clients. Accordingly, this factor strongly favors a conclusion that the De La Fuentes' attorney fee request is reasonable.

### (10). "Undesirability of the case"

What makes the circumstances of this case undesirable is that W & P had to perform services for the De La Fuentes at all, when the De La Fuentes thought that all matters had been resolved through the entry of the Agreed Judgment. Having to enforce the Agreed Judgment leaves clients such as the De La Fuentes to wonder about the effectiveness of their own counsel, who then have to turn around and re-sue the bad-faith creditor (here, Wells Fargo) in order to not only obtain the result that everyone thought had already been achieved, but also to regain the confidence of the consumer debtor. Accordingly, this factor favors a conclusion that the De La Fuentes' attorneys' fee application is reasonable.

### (11). Nature and length of the professional relationship with the client

There is nothing in the record addressing this factor. Accordingly, the Court concludes that this factor neither favors no disfavors a conclusion that the De La Fuentes' attorneys' fee application is reasonable.

### (12). Awards in similar cases

There is nothing in the record addressing this factor. Accordingly, the Court concludes that this factor neither favors no disfavors a conclusion that the De La Fuentes' attorneys' fee application is reasonable.

### f. Attorneys' fees and expenses in the amount of $4,544.00 should be awarded to the De La Fuentes

A review of the twelve factors indicates that eight factors favor a conclusion that the De La Fuentes' attorneys' fee application is reasonable; and the other four factors tip the scale in neither direction. Under these circumstances, the Court concludes that the De La Fuentes' attorneys' fee application is reasonable so long as a reduction of $585.00 is made from the requested fee award of $5,129.00. Accordingly, this Court awards the De La Fuentes $4,544.00 (i.e., $5,129.00—$585.00 = $4,544.00) in attorneys' fees and ex-

penses. Wells Fargo shall deliver a check in this amount to W & P by the close of business on May 21, 2010.

## V. CONCLUSION

"In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), Pub.L. No. 109–8, 119 Stat. 23 (2005). The BAPCPA is a 'comprehensive package of reform measures' designed 'to improve bankruptcy law and practice by restoring personal responsibility and integrity to the bankruptcy system and [to] ensure that the system is fair for both debtors and creditors.'" *Hersh v. U.S. (ex rel. Mukasey)*, 553 F.3d 743, 746 (5th Cir.2008) (quoting H.R.Rep. No. 109–31(I), 109th cong. 1st Sess. pt. 1, at 2 (2005), reprinted in 2005 U.S.C.C.A.N. Vol. 4 at 88, 89). The passing of BAPCPA was applauded by the financial industry. The American Financial Services Association (AFSA), a financial industry lobbying entity which Wells Fargo has been and continues to be involved in, lobbied vigorously for BAPCPA and applauded its passage. An AFSA press release sent out on the day BAPCPA went into effect, stated that: "[t]he bankruptcy law going into effect today ... *encourages personal accountability and responsibility*, the law also will bring changes to an overburdened, antiquated system, allowing it to better serve those in need of bankruptcy relief." [28] (emphasis added).

This Court certainly agrees that personal accountability and responsibility are critical to maintaining the integrity of the bankruptcy system. However, in its zeal to see debtors be held personally accountable for their actions, Wells Fargo seems to have forgotten—at least in the case at bar—that the integrity of the bankruptcy system requires the good faith of both debtors **and creditors.** *See In re West Delta Oil Co., Inc.*, 2003 WL 21016578 at *3 n. 7 (5th Cir.2003) (citing *In re Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir.1999) ("[t]he court notes that 'the integrity of the bankruptcy system depends on full and honest disclosure by debtors ... [t]he interests of both the creditors and the bankruptcy court ... are impaired when the disclosure provided by the debtor is incomplete.' This is no less true when the lack of full and honest disclosure is on the part of the creditor.")); *See also In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir.1986) ("... a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (*i.e.*, avoidance of liens, discharge of debts, marshalling and turnover of assets) available only to those debtors and creditors with 'clean hands.'"). Grissom's testimony, and Wells Fargo's own records, indicate that in with respect to the De La Fuentes' loan, Wells Fargo has had difficulty accepting personal accountability and responsibility.

---

**28.** Press Release, American Financial Services Association, Statement Regarding Today's Enactment of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Oct. 17, 2005). American Financial Services Association (AFSA) is a trade association for the financial services industry. *See* http://afsaonline.org. Wells Fargo Financial, a division of Wells Fargo & Company, is a member of AFSA. Fact Sheet, American Financial Services Association (Oct. 17, 2005). Wells Fargo Financial has two representatives working for AFSA: Dennis E. Young (CFO,

Wells Fargo Financial and Chairman of AFSA's Financial Relations Committee), David Kvamme (President and CEO, Wells Fargo Financial, and Member of the AFSA Board of Directors). *Id.* Thomas P. Shippee, while President & CEO of Wells Fargo Financial, was on the AFSA Board of Directors when this statement was made. *See* American Financial Services Association, Annual Report 2004 16 (2005); American Financial Services Association, Annual Report 2005 (2006).

In sum, the De La Fuentes have played by the rules of the bankruptcy system. Wells Fargo however, has not. It has not only generated inaccurate information about the De La Fuentes' loan, but it has done so in violation of the Agreed Judgment. Wells Fargo's conduct in this instance is particularly egregious because agreed orders (such as the Agreed Judgment) are the grease that lubricate the wheels of the bankruptcy system. The bankruptcy practice throughout this country is heavily laden with motions, many of which are resolved through the submission of agreed orders. If the parties to these agreed orders are unwilling to abide by them, then the entire bankruptcy system will break down. The Court hopes that at the May 28 hearing, it will be able to conclude that Wells Fargo is in complete compliance with the Agreed Judgment.

An order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.